**Received Electronically**
**November 25, 2020**
**United States Court of Appeals**
**For the First Circuit**

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

---

IN RE AIRES DA GRACA, CONROY LEWIS, CYRIL OKOLI, DARLIN ALBERTO GUILLERMO, DIMITAR DASKALOV, EDSON MARTINS, EMMANUEL LOPEZ, FLAVIO PRADO JUNIOR, FRED KAYITARE, GABRIEL DE LA PAZ, JOAO AMADO, AND KEITH WILLIAMS,

*Petitioners.*

---

Petition for a Writ of Mandamus to the United States District Court for the District of Massachusetts in Case No. 20-cv-10617, Judge William G. Young

---

## PETITION FOR WRIT OF MANDAMUS

---

Sameer Ahmed (1st Cir. No. 1161854)
Harvard Law School Crimmigration Clinic
6 Everett Street; Suite 3105
Cambridge, Massachusetts 02138
Telephone: (617) 384-0088
sahmed@law.harvard.edu

*Counsel for the Petitioners*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.......................... vi

INTRODUCTION ...............................................................................1

ISSUES PRESENTED..........................................................................3

FACTUAL BACKGROUND....................................................................3

   I.   THE COVID-19 PANDEMIC THAT LED TO THE DISTRICT COURT LITIGATION.............................................................................3

   II.  THE DISTRICT COURT'S GRANTS AND DENIALS OF BAIL .............4

STANDARD OF REVIEW ...................................................................11

REASONS WHY THE WRIT SHOULD ISSUE .....................................11

   I.   THE COURT SHOULD ISSUE A WRIT OF SUPERVISORY MANDAMUS ORDERING THE DISTRICT COURT TO RELEASE PETITIONERS ON BAIL ..........................................................13

     A.  The District Court Applied the Wrong Legal Standard in Denying Petitioners' Bail .....................................................................13

     B.  Even if Exceptional Circumstances Are Required, the District Court Committed Palpable Error by Failing to Find That Such Circumstances Were Present.......................................................................18

     C.  The District Court Abused Its Discretion by Failing to Provide Any Justification For Denying Petitioners' Bail Applications ......................21

        1.  Petitioners' Serious Personal Health Conditions.................................22

        2.  Petitioners' Ties to the Community ....................................................23

    3.    Other Equitable Factors Weighing in Petitioners' Favor ...................24

  D.  There Are Special Risks of Irreparable Harm if Mandamus Is Not
      Granted ....................................................................................................25

II.  IN THE ALTERNATIVE, THE COURT SHOULD ISSUE A WRIT OF
     ADVISORY MANDAMUS BECAUSE PETITIONERS' DENIAL OF
     BAIL RAISES IMPORTANT AND NOVEL QUESTIONS THAT ARE
     LIKELY TO RECUR BUT COULD OTHERWISE EVADE EFFECTIVE
     REVIEW ..................................................................................................27

  A.  The District Court's Bail Determinations Raise Novel Questions of
      Substantial Public Importance..................................................................27

  B.  The Novel Questions Are Likely to Recur...............................................29

  C.  Deferral of Review Would Impair Effective Review Later On ..............29

CONCLUSION........................................................................................................30

CERTIFICATE OF COMPLIANCE .......................................................................32

CERTIFICATE OF SERVICE ................................................................................32

ADDENDUM ..........................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020) ............................... 20

*Arevalo v. Hennesy*, 882 F.3d 763 (9th Cir. 2018) .................................................. 26

*Aronson v. May*, 85 S.Ct. 3 (1964) ........................................................................ 14

*Atkins v. Michigan*, 644 F.2d 543 (6th Cir. 1981) .................................................. 21

*Baker v. Sard*, 420 F.2d 1342 (D.C. Cir. 1969) ................................................ 14, 17

*Boumediene v. Bush*, 553 U.S. 723 (2008) ............................................................. 15

*Boyer v. United States*, 2020 WL 1978190 (D. Mass. Apr. 24, 2020) ................... 28

*Calley v. Callaway*, 496 F.2d 701 (5th Cir. 1974) .................................................. 17

*Calvary Chapel Dayton Valley v. Sisolak*, 140 S.Ct. 2603 (2020) ........................ 19

*Concepcion v. Hazlewood*, 2019 WL 376389 (D.N.H. Jan. 9, 2019) .................... 28

*Dep't of Homeland Sec. v. Thuraissigiam*, 140 S.Ct. 1959 (2020) ....................... 15

*Dickinson v. Zurko*, 527 U.S. 150 (1999) ............................................................... 14

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) .......................................... 21

*Dotson v. Clark*, 900 F.2d 77 (6th Cir. 1990) .................................................... 14, 17

*Eaton v. Holbrook*, 671 F.2d 670 (1st Cir. 1982) ................................................... 13

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................................... 25

*Ex parte Yerger*, 75 U.S. 85 (1868) ....................................................................... 14

*Glynn v. Donnelly*, 420 F.2d 95 (1st Cir. 1972) ............................................... Passim

*Gomes v. Dep't of Homeland Sec., Acting Secretary*, 460 F.Supp.3d 132 (D.N.H. 2020)........................................................................................................ 28

*Harris v. Reed*, 489 U.S. 255 (1989) ....................................................... 16

*Illarramendi v. United States*, 906 F.3d 268 (2d Cir. 2018).................................. 17

*In re Abbott*, 954 F.3d 772 (5th Cir. 2020) ............................................. 20

*In re Grand Jury Subpoena*, 909 F.3d 26 (1st Cir. 2018)........................... 11, 25, 30

*In re Sony BMG Music Entertainment*, 564 F.3d 1 (1st Cir. 2009)........................ 11

*In re Sterling-Suarez*, 306 F.3d 1170 (1st Cir. 2002) ............................................ 11

*Johnson v. Connolly*, 378 F. App'x 107 (2d Cir. 2010) ......................................... 25

*Johnston v. Marsh*, 227 F.2d 528 (3rd Cir. 1955) ............................................ 14, 16

*Land v. Deeds*, 878 F.2d 318 (9th Cir. 1989) ........................................................ 17

*Lucas v. Hadden*, 790 F.2d 365 (3rd Cir. 1986) .................................................... 17

*Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001) ................................................... Passim

*Martin v. Solem*, 801 F.2d 324 (8th Cir. 1986)...................................................... 17

*Mass. Ass'n of Older Americans v. Sharp*, 700 F.2d 749 (1st Cir. 1983) .............. 25

*Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006) .................................................... 18

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014) ......... 18

*Ostrer v. United States*, 584 F.2d 594 (2d Cir. 1978)............................................ 17

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005)  ......... 24

*Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013)  ................................. 27, 29

*Savino v. Souza*, 453 F.Supp.3d 441 (D. Mass. 2020)......................................Passim

*Savino v. Souza*, 459 F.Supp.3d 317 (D. Mass. 2020)......................................Passim

*Savino v. Souza*, 2020 WL 3529664 (D. Mass. Jun. 18, 2020) ................... 3, 16, 26

*South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613 (2020) ........... 18

*Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020) ................................................... 20

*Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020) ...................................................... 20

*United States v. Bogle*, 855 F.2d 707 (11th Cir. 1988)........................................... 26

*United States v. Horn*, 29 F.3d 754 (1st Cir. 1994)......................................... 11, 27

*United States v. Lacy*, 643 F.2d 284 (5th Cir. 1981) ................................. 15, 18, 20

*United States v. McKenzie*, 318 F. App'x 202 (4th Cir. 2009).............................. 21

*United States v. Pleau*, 680 F.3d 1 (1st Cir. 2012) .........................................Passim

*United States v. Roeder*, 807 F. App'x 157 (3d Cir. 2020) ................................... 19

*United States v. Weicksel*, 517 F. App'x 67 (3d Cir. 2012)................................... 17

*United States v. Zimny*, 460 F.Supp.3d 117 (D. Mass. 2020)............................... 28

*Woodcock v. Donnelly*, 470 F.2d 93 (1st Cir. 1972)......................................Passim

*Xochihua-James v. Barr*, 962 F.3d 1065 (9th Cir. 2020) ...................................... 19

*Yanes v. Martin*, 464 F.Supp.3d 467 (D.R.I. 2020)............................................... 28

## Statutes

28 U.S.C. § 1651 ................................................................................................. 1, 11

**Rules**

Fed. R. App. P. 9(a)(1) ............................................................................. 21

Fed. R. App. P. 21 ..................................................................................... 1

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Petitioners respectfully request that oral argument be heard in this case. This petition pertains to pressing concerns regarding the risk of severe illness or death to Petitioners if they contract COVID-19 while detained. In addition, the petition presents important issues about the standard that governs an application for bail by a habeas petitioner, and how to apply this Court's binding precedent concerning that standard. The district court analyzed the individual circumstances of each class member, denying bail to the twelve Petitioners without providing reasoning for why they failed to meet the standard adopted by the court. Oral argument will aid this Court in resolving these issues.

# INTRODUCTION

Petitioners are twelve civil immigration detainees held at the Bristol County House of Corrections and C. Carlos Carreiro Detention Center (collectively, "BCHOC"). Pursuant to the All Writs Act, 28 U.S.C. § 1651, and Rule 21 of the Federal Rules of Appellate Procedure, Petitioners respectfully ask this Court to issue a writ of mandamus reversing orders by the district court denying Petitioners bail despite the extremely harmful and unsafe conditions of their detention during the COVID-19 pandemic.[1]

Petitioners have comorbidities putting them at high risk of serious harm or death should they contract COVID-19. In March 2020, Petitioners joined a habeas class action against U.S. Immigration and Customs Enforcement ("ICE") and certain BCHOC officials (collectively, the "Government") to challenge their detention during the pandemic. Petitioners contend, *inter alia*, that the Government has exhibited deliberate indifference to a significant risk of serious harm in violation of the Fifth Amendment. The district court found that Petitioners are likely to succeed on the merits of this claim. However, despite the serious harm Petitioners face due to their continued detention during the pandemic, the court

---

[1] Petitioners have also filed a notice appealing their denials of bail to this Court (Case No. 20-1626). They filed their opening brief in that appeal on November 24, 2020. However, Petitioners also file this petition for a writ of mandamus in the event this Court finds that it does not have jurisdiction over Petitioners' collateral appeal.

denied their bail applications.

The district court erred in denying the bail applications because it applied the wrong legal standard. Under this Court's precedent, bail should be granted either if a habeas petitioner is likely to succeed on the merits *or* there are exceptional circumstances. *See Glynn v. Donnelly*, 420 F.2d 95, 98 (1st Cir. 1972). The district court instead erroneously assumed that *both* thresholds had to be met. Furthermore, even if the district court's standard was correct, it failed to properly apply that standard to Petitioners. Rather than recognizing that the COVID-19 pandemic is an "exceptional circumstance," the court simply appeared to assess whether Petitioners were a flight risk or danger to the community. However, the district court never provided any reasoning (orally or in writing) for denying the bail applications in respect to the Petitioners. That by itself is an abuse of discretion and requires reversal.

Therefore, this Court should issue a writ of either supervisory or advisory mandamus. Supervisory mandamus is appropriate because the district court palpably erred in a way that has caused Petitioners irreparable harm given their continued illegal and unsafe detention during the pandemic. Alternatively, advisory mandamus is appropriate to ensure that the district court applies the correct legal standard when determining bail applications from Petitioners and others, as the COVID-19 pandemic continues to ravage communities in Massachusetts and

across the United States.

## ISSUES PRESENTED

1.     Because the district court found that Petitioners are likely to succeed in their habeas claim, should the district court have granted Petitioners' bail applications under governing First Circuit precedent?

2.     Even if it were proper for the district court to consider "exceptional circumstances," is a once-in-a-century global pandemic sufficiently "exceptional" to warrant bail for Petitioners?

3.     Did the district court err by denying Petitioners' bail applications without providing any justification for its reasoning?

## FACTUAL BACKGROUND

### I.    THE COVID-19 PANDEMIC THAT LED TO THE DISTRICT COURT LITIGATION

By March 26, 2020, the United States had 83,507 reported cases of COVID-19. *See* Pet. Writ Habeas Corpus, App'x 3 ¶ 8. The Centers for Disease Control and Prevention ("CDC") had forecast that at least 200,000 people in the country would die from the virus, *id.* 4 ¶ 17, a prediction that has already tragically been surpassed. COVID-19 spreads through close proximity to infected persons, especially while indoors. *Id.* at 4 ¶ 15.

In March, 148 immigration detainees were detained by the Government at BCHOC. *See Savino v. Souza*, 453 F.Supp.3d 441, 443–44 (D. Mass. 2020). The

- 3 -

Government responded to the pandemic in a way that was "downright irrational, not to mention inhumane." *Savino v. Souza*, No. 20-10617-WGY, 2020 WL 3529664 at *3 (D. Mass. Jun. 18, 2020). It confined detainees to "unsafe crowded quarters." *Savino v. Souza*, 459 F.Supp.3d 317, 332 (D. Mass. 2020). It forced detainees to interact with symptomatic guards, sleep in beds three feet apart, and eat meals next to one another. Pet. Writ Habeas Corpus, App'x 15 ¶ 68. The Government also refused to ensure basic standards of hygiene, for example depriving detainees of adequate soap, toilet paper, and medical resources. *Id.* at 15 ¶ 70.

Fearing for their lives, the detainees sought release pending the conclusion of their immigration cases. On March 27, 2020, two filed a habeas petition in the District of Massachusetts, on behalf of themselves and those similarly situated. *Id.* at 1. The detainees claimed, *inter alia*, that the circumstances of detention, together with the risk of contracting COVID-19, violate the Due Process Clause. *Id.* at 22 ¶¶ 100–01. That same day, the detainees also filed a motion for a temporary restraining order, requesting "[r]elease of plaintiffs and all similarly situated detainees" at BCHOC. Notice and Mot. for TRO, App'x 26 ¶ 1. The district court *sua sponte* converted this motion into one for a preliminary injunction. *Savino*, 453 F.Supp.3d at 446.

## II.    THE DISTRICT COURT'S GRANTS AND DENIALS OF BAIL

At a hearing on April 3, 2020, the district court explained how it would approach the detainees' request for release pending a final determination of their substantive claims. The Court stated that it could use its "inherent authority" to grant bail to some petitioners. *See* Tr., Add. 12. At that same hearing, the court found that the detainees' habeas claims had "a reasonable likelihood of success." *Id.* However, instead of granting bail to all members of the detainee class pending final determination of those claims, the court stated that it would individually assess the merits of release for each detainee, and requested that the parties submit a written brief for each of them. *See id.* at 23, 25. The court also anticipated that it would stop reviewing bail applications once BCHOC reached "some acceptable level of confinement" that would allegedly reduce infection risk. *Id.* at 24.

On April 8, 2020, the district court issued a written decision expanding on its authority to grant bail. *See Savino*, 453 F.Supp.3d at 453–54. It held that it had "inherent power to release the petitioner pending determination of the merits." *Id.* at 453. In exercising this power, the court said it would apply the Second Circuit's standard in *Mapp v. Reno*, 241 F.3d 221, 223 (2nd Cir. 2001), which requires a "habeas petition [to] raise substantial claims" and the petitioner to demonstrate "extraordinary circumstances" to be released on bail. *Savino*, 453 F.Supp.3d at 453. However, a subsequent decision by the district court clarifies that it did *not* address any "extraordinary circumstances" when resolving bail applications, but

rather assessed their release "to minimize danger to the community and curtail the risk of flight." *Savino*, 459 F.Supp.3d at 322 n.4. The court recognized that "the great bulk of these 148 detainees . . . would have been admitted to bail on terms were they American citizens facing criminal charges. The fact I did not release more is due solely to the proper respect I owe to the administrative hearing officers within the executive." *Id.*

Claiming to apply this standard—and despite the continuing health emergency and the court's finding that the detainees were likely to succeed on the merits—the district court denied bail to the twelve Petitioners without providing any reasons for any of the denials:

- Aires da Graca has lived in the United States as a lawful permanent resident for thirty years since the age of thirteen. His grandparents, mother, brothers, partner, and four children are all U.S. citizens living in Rhode Island. Mr. da Graca has been ███████████████████████████ ████████████████████████████,[2] and ███████. *See* Supp. App'x 1–2. Nonetheless, the district court denied him bail. *See*

---

[2] Mental and depressive disorders are known to increase vulnerability to COVID-19. *See, e.g.*, Luming Li et al., *Association of a Prior Psychiatric Diagnosis with Mortality Among Hospitalized Patients with Coronavirus Disease 2019 (COVID-19) Infection*, JAMA Network Open (Sept. 30, 2020), *available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2771037 (recognizing "that psychiatric comorbidity might increase Coronavirus Disease 2019 (COVID-19)–related mortality").

Add. 2 (ECF No. 107).

- Flavio Prado Junior has a 

  

  . His wife and children are U.S. citizens. *See* Supp. App'x 59–60.

  Nonetheless, the district court denied him bail. *See* Add. 3 (ECF No. 112).

- Keith Williams has lived in the United States as a lawful permanent resident

  for thirty-five years. His daughter, mother, and five siblings are all U.S.

  citizens. He is 

  .

  *See* Supp. App'x 105–06. On October 20, 2020,

  . *Id.* at 145. Nonetheless, the district court

  denied him bail. *See* Add. 2 (ECF No. 107).

- Conroy Lewis is a thirty-year-old father who has lived as a lawful permanent

  resident in the United States for half his life. His fiancée, stepmother, aunt

  and three children are all U.S. citizens.

  *See* Supp. App'x 5–6. On October 26, 2020,

████████████████████████. *Id.* at 141. Nonetheless, the district

court denied him bail. *See* Add. 3 (ECF No. 112).

- Joao Amado has lived as a lawful permanent resident for thirty-six years,

  and came to the United States when he was eleven years old. Most of his

  family members, including his two children, are U.S. citizens. Mr. Amado

  has ████████████████████████████. *See*

  Supp. App'x 103–04. Nonetheless, the district court denied him bail. *See*

  Add. 3 (ECF No. 117).

- Dimitar Daskalov is ██████████████████████. He has two

  young children who are U.S. citizens, one of whom he has never been able

  to meet because she was born while he was detained. *See* Supp. App'x 30–

  31. Nonetheless, the district court denied him bail. *See* Add. 3 (ECF No.

  112).

- Emmanuel Lopez has lived in the United States for thirty-two years, having

  arrived when he was two years old. All his family members, including his

  mother, brother, and three niece and nephews live in the United States. ███

  ████████████████████. *See* Supp. App'x 48–49. Nonetheless, the

  district court denied him bail. *See* Add. 4 (ECF No. 135).

- Fred Kayitare fled to the United States in 2016, ████████████████

  ███████████████████████████████████████.

████████████████████████████. ████████████████████

████████████████. *See* Supp. App'x 81–82. Nonetheless, the district

court denied him bail. *See* Add. 3 (ECF No. 117).

- Darlin Alberto Guillermo came to the United States when he was nine years

  old and has lived here as a lawful permanent resident for twenty-eight years.

  All his family members, including his three children, live in the United

  States. ████████████████████████████████

  ██████████████████ *See* Supp. App'x 14–15, 140. Nonetheless, the district

  court denied him bail. *See* Add. 3 (ECF No. 117).

- Gabriel de la Paz is a lawful permanent resident who recently took his

  citizenship test. His two brothers are U.S. citizens. ████████████████

  ████████ and no convictions or pending charges for violent crimes. *See* Supp.

  App'x 101–02. Nonetheless, the district court denied him bail. *See* Add. 4

  (ECF No. 135).

- Edson Martins' three children are in the United States. Prior to his detention,

  he financially supported his children, but has not been able to since he was

  detained. He has no criminal convictions ████████████████████

  ████████████████████████████████. *See* Supp. App'x

  38–39. Mr. Martins ████████████████████████████████

  ██████████████ *See id.* at 142. Nonetheless, the district court denied

him bail. *See* Add. 3 (ECF No. 112).

- Cyril Okoli is married to a U.S. citizen and has no criminal convictions. He is an active member of his church. *See* Supp. App'x 5–6. Nonetheless, the district court denied him bail. *See* Add. 3 (ECF No. 117).

After denying Petitioners' bail, on May 7, 2020, the district court issued a preliminary injunction that prohibited admission of any further detainees to BCHOC, and ordered COVID-19 testing of all remaining detainees and staff. Add. 5 (ECF No. 168). The district court found that the detainees were likely to suffer irreparable harm. *See Savino*, 459 F.Supp.3d at 327. The court added that the detainees were likely to show that the Government had acted with deliberate indifference to a substantial risk of serious harm to them. *See id.* at 331. In particular, there were "at least three cavernous holes in the government's mitigation strategy." *Id.* at 329. These were the Government's refusals to consider release of detainees, to test detainees for COVID-19, and to contact trace positive cases. *See id.* at 329–31.

Litigation in the district court is ongoing. On June 22, 2020, Petitioners filed a notice appealing their denials of bail to this Court (Case No. 20-1626). While that appeal continues, Petitioners also file this petition for a writ of mandamus in the event the Court finds that it does not have jurisdiction over Petitioners' collateral appeal. Petitioners remain detained at BCHOC. They therefore remain at high risk

of contracting COVID-19, even though many are especially vulnerable to the virus and could die from it.

## STANDARD OF REVIEW

Under the All Writs Act, 28 U.S.C. § 1651, this Court may issue a writ of mandamus to reverse a lower court's order or decision. *See, e.g.*, *United States v. Horn*, 29 F.3d 754, 769 (1st Cir. 1994).

The First Circuit distinguishes between "supervisory" and "advisory" mandamus. *See, e.g.*, *id.* at 769 n.19; *In re Grand Jury Subpoena*, 909 F.3d 26, 29 (1st Cir. 2018). Supervisory mandamus is appropriate when: (1) a lower court has exceeded the limits of judicial power such as through an abuse of discretion; (2) the lower court's error is "palpably erroneous"; and (3) there is a "special risk of irreparable harm" if the error is not corrected. *Id.* at 28.

By comparison, advisory mandamus is appropriate when: (1) the district court's order raises an "unsettled" question "of substantial public importance"; (2) that question is "likely to recur"; and (3) deferral of review would impair the opportunity for effective review later on. *United States v. Pleau*, 680 F.3d 1, 4 (1st Cir. 2012) (en banc). It is unnecessary to show irreparable harm or palpable error. *In re Sony BMG Music Entertainment*, 564 F.3d 1, 4 (1st Cir. 2009); *In re Sterling-Suarez*, 306 F.3d 1170, 1172 (1st Cir. 2002).

## REASONS WHY THE WRIT SHOULD ISSUE

The district court erred in denying Petitioners' bail applications. It should have applied this Court's standard in *Glynn* and *Woodcock*, under which bail is warranted if *either* a habeas petitioner is likely to succeed on the merits *or* there are exceptional circumstances. Instead, the district court relied on the Second Circuit's standard in *Mapp*, which requires *both* likely success on the merits *and* exceptional circumstances. Under the correct standard, after finding likely success on the merits, the district court should have granted Petitioners bail. Further, even if exceptional circumstances were necessary to warrant bail, the district court failed to apply that standard. The Court failed to recognize that the COVID-19 pandemic is an "exceptional circumstance," and instead denied Petitioners bail without providing any reasoning for its decisions.

Given the district court's errors, supervisory mandamus is appropriate to reverse the denials of bail and to direct the district court to grant bail to Petitioners because the court committed palpable error and Petitioners continue to suffer irreparable harm through their illegal detention and exposure to a deadly virus. In the alternative, advisory mandamus is appropriate because the district court's departure from First Circuit precedent raises a novel, important and recurring question concerning the legal standard for bail applications by habeas petitioners during the COVID-19 pandemic. Thus, this Court should issue a writ confirming that a habeas petitioner need only establish likely success on the merits or

exceptional circumstances to obtain bail.

## I.  THE COURT SHOULD ISSUE A WRIT OF SUPERVISORY MANDAMUS ORDERING THE DISTRICT COURT TO RELEASE PETITIONERS ON BAIL

### A.  The District Court Applied the Wrong Legal Standard in Denying Petitioners' Bail

The district court applied the wrong legal standard when denying Petitioners' bail applications. A federal court entertaining a habeas petition has inherent authority to release the petitioner on bail pending determination of the merits. *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972). According to the First Circuit, there are two separate grounds on which a court should grant bail. In *Glynn*, this Court held that, "in the absence of exceptional circumstances— whatever that may include—the court will not grant bail prior to the ultimate final decision unless petitioner presents not merely a clear case on the law . . . but a clear, and readily evident, case on the facts." 470 F.2d at 98. Therefore, it is appropriate to release a habeas petitioner on bail if *either* there are "exceptional circumstances" *or* the petitioner demonstrates a clear case. *See also Eaton v. Holbrook*, 671 F.2d 670, 670, 673 (1st Cir. 1982) (assuming the *Glynn* standard applied but finding that a petitioner had not exhausted her state remedies).

As *Glynn* makes clear, these grounds—a clear case or exceptional circumstances—are alternatives warranting a grant of bail. Therefore, a clear case is enough to warrant bail "in the absence of" exceptional circumstances. *Glynn*,

470 F.2d at 98. Here, *Glynn*'s use of "clear case" does not denote a term of art. *Cf. Dickinson v. Zurko*, 527 U.S. 150, 155–56 (1999) (observing that phrases like "clear case of error" do not have a fixed meaning). In *Woodcock*, this Court considered determinative that a petitioner had not "established the likelihood of success on the merits" to deny his bail application. 470 F.2d at 94. Thus, a "clear case" is at least one where petitioners have shown a likelihood of success on the merits.[3]

Conversely, a decision to grant bail can also be made solely where there are exceptional circumstances even though the grant of bail has "nothing to do with a decision on the merits of the petition." *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990). For example, in *Johnston v. Marsh*, 227 F.2d 528 (3rd Cir. 1955), the court affirmed the grant of bail to a habeas petitioner who, as a diabetic, needed hospital

---

[3] While *Glynn* suggests that a "clear case" may be a higher burden than a "substantial case," it did so in the context of a criminal habeas proceeding challenging a criminal conviction where "[t]he presumption [of innocence] fades upon conviction." *Glynn*, 470 F.2d at 98-99. Here, Petitioners are civil immigration detainees. Therefore, no such higher burden is warranted. *See Aronson v. May*, 85 S.Ct. 3, 5 (1964) (Douglas, J., in chambers) ("It is obvious that a greater showing of special reasons for admission to bail pending review should be required in [a case where the applicant is incarcerated following a conviction] than would be required in a case where applicant had sought to attack by writ of habeas corpus an incarceration not resulting from a judicial determination of guilt.").

treatment without finding that the petitioner was likely to succeed in his claim.[4] *Id.* at 529.

There are sound reasons why a petitioner only needs to satisfy either likelihood of success or exceptional circumstances to warrant release. For one, habeas corpus is "a vital instrument" for securing "freedom from unlawful restraint," *Boumediene v. Bush*, 553 U.S. 723, 739 (2008), a means for removing "the injury of unjust and illegal confinement," *Department of Homeland Security v. Thuraissigiam*, 140 S.Ct. 1959, 1969 (2020), and "the best and only sufficient defen[s]e of personal freedom," *Ex parte Yerger*, 75 U.S. 85, 95 (1868). Given the privileged nature of the writ in our legal system and the fact that personal liberty is at stake, a finding that Petitioners are likely entitled to habeas relief should be more than sufficient to warrant bail pending final determination of the illegality of their detention.[5]

Conversely, even if a court has yet to find likelihood of success on the merits, it should also have the authority to release habeas petitioners in

---

[4] Some courts have recognized that one way to show exceptional circumstances is by demonstrating that the habeas claim is likely to succeed. *See, e.g.*, *Baker v. Sard*, 420 F.2d 1342, 1343–44 (D.C. Cir. 1969) ("A forceful special circumstance is the likelihood of success.").

[5] The Fifth Circuit has therefore recognized that "the raising of substantial claims upon which the [petitioner] has a high probability of success" by itself warrants bail for a habeas petitioner. *United States v. Lacy*, 643 F.2d 284, 285 (5th Cir. 1981).

"exceptional circumstances." A requirement for such circumstances operates as a "safety valve" for when it may be too early to prove probable entitlement to habeas relief, but something distinctive about the case makes early release necessary. *Cf. Harris v. Reed*, 489 U.S. 255, 271 (1989) (O'Connor J., concurring) (describing the "extraordinary case" exception for when a habeas petitioner is able to demonstrate their factual innocence as a "safety valve"). Therefore, if exceptional circumstances have been shown, a petitioner need not *also* prove likelihood of success on the merits. For example, where, as in *Johnston*, a petitioner requires release for medical reasons, the district court should be able to grant that relief. 227 F.2d at 529.

In this case, the district court applied the wrong standard to Petitioners' bail applications by requiring *both* likelihood of success on the merits and exceptional circumstances. It conflated these requirements, asking "whether 'the habeas petition raise[s] substantial claims *and* [whether] extraordinary circumstances exist[] that make the grant of bail necessary.'" *Savino*, 453 F.Supp.3d at 453 (emphasis added). But here, the court had found that the detainees were likely to succeed on the merits, and therefore had substantial claims and a clear case. *See* Tr., Add. 12; *Savino*, 459 F.Supp.3d at 331; *Savino*, 2020 WL 3529664 at *2. That finding was grounded in the "cavernous holes in the government's mitigation strategy" to reduce the risk of contracting COVID-19 in BCHOC which pointed to

deliberate indifference to a substantial risk of serious harm to Petitioners because of their continued incarceration during the pandemic. *Savino*, 459 F.Supp.3d at 329.

Having made this finding, *Glynn* required the district court to end the inquiry there and to grant bail to the detainees pending a final determination on the merits. It was unnecessary to ask if there were *also* exceptional circumstances.[6] Such circumstances, rather, represent an entirely separate and sufficient ground for ordering bail. But, by failing to apply First Circuit precedent, the district court added an unnecessary obstacle to Petitioners' release. Petitioners therefore remain

---

[6] That other courts might have adopted a different standard is no justification for departing from *this* Circuit's binding precedent. The district court cited the Second Circuit's opinion in *Mapp*, which interpreted the two grounds for bail not as alternatives but as conjunctive requirements. *See Savino*, 453 F.Supp.3d at 453 (*citing Mapp*, 241 F.3d at 230). But that reading does not present this Circuit's law. In any case, there is no consensus among other circuits as to which standard should apply. *Compare Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (describing "a showing of exceptional circumstances" as sufficient), *Ostrer v. United States*, 584 F.2d 594, 596 n.1 (2d Cir. 1978) (asking only if there were "extraordinary or exceptional circumstances"), *Land v. Deeds*, 878 F.2d 318, 318 (9th Cir. 1989) (holding that "[b]ail pending a decision in a habeas case is reserved for extraordinary cases involving special circumstances or a high probability of success"), *and United States v. Weicksel*, 517 Fed.Appx. 67, 68 (3d Cir. 2012) (asking whether "the petitioner has raised substantial constitutional claims on which he has a high probability of success . . . or exceptional circumstances" exist), *with Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974), *Lucas v. Hadden*, 790 F.2d 365, 367 (3d Cir. 1986), *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986), *Dotson*, 900 F.2d at 79, *Mapp*, 241 F.3d at 230, *and Illarramendi v. United States*, 906 F.3d 268, 271 (2d Cir. 2018) (reading the two requirements conjunctively).

detained in unsafe conditions even as COVID-19 case numbers rise around the country, and they would have been released if the district court had applied the correct standard.

> **B.     Even if Exceptional Circumstances Are Required, the District Court Committed Palpable Error by Failing to Find That Such Circumstances Were Present**

Even if the district court was required to find exceptional circumstances before granting bail to Petitioners, it further erred by failing to find such circumstances here.

The word "exceptional" means "uncommon" or "out of the ordinary course." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). For the purposes of a bail application by a habeas petitioner, exceptional circumstances include a "health emergency." *Woodcock*, 470 F.2d at 94. Other examples of exceptional circumstances include when a petitioner proves that their claim has "high probability of success," or when there has been an "unusual delay in the process." *United States. v. Lacy*, 643 F.2d 284, 285 (5th Cir. 1981).

Here, the district court never addressed whether there were exceptional circumstances necessitating Petitioners' release. In fact, it did not provide any reasons at all for why the court denied Petitioners' bail applications. Instead, the court subsequently indicated that it simply analyzed whether Petitioners were a "danger to the community" or flight risk, appearing to adopt a standard similar to

- 18 -

pre-trial release for criminal defendants or in immigration court bond proceedings.
*Savino*, 459 F.Supp.3d at 322 n.4; *see Matter of Guerra*, 24 I&N Dec. 37, 39 (BIA
2006) (holding that Immigration Court bond proceedings assess whether a detainee
is "a danger to the community at large" or "likely to abscond"). Even under that
standard, the district court recognized that it likely would have "release[d] more"
detainees, but did not "due solely to the proper respect [it] owe[d] to the
administrative hearing officers within the executive." *Savino*, 459 F.Supp.3d at 322
n.4. Thus, Petitioners' bail applications likely were futile because of the district
court's "deference" and failure to acknowledge the exceptional circumstances
underpinning their requests for release.

Instead, the district court should have held that the unprecedented COVID-
19 pandemic comprises exceptional circumstances requiring Petitioners' release.
*See, e.g.*, *Xochihua-James v. Barr*, 962 F.3d 1065, 1066 (9th Cir. 2020) (*sua
sponte* releasing a detainee solely "[i]n light of the rapidly escalating health
crisis"). The pandemic, the district court acknowledged, involves a "highly
contagious virus" that has "brought [the world] to its knees," *Savino*, 453
F.Supp.3d at 443, and constitutes an "unparalleled health crisis," *Savino*, 459
F.Supp.3d at 320. Other courts have characterized the pandemic in similar terms.
*See, e.g.*, *South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613, 1613
(2020) (Roberts, C.J., concurring) (calling COVID-19 an "extraordinary health

emergency"); *Calvary Chapel Dayton Valley v. Sisolak*, 140 S.Ct. 2603, 2610

(2020) (Kavanaugh, J., dissenting) (describing the pandemic as "devastating");

*United States v. Roeder*, 807 F. App'x 157, 161 (3d Cir. 2020) (observing that the

pandemic "has given rise to exceptional and exigent circumstances that require the

prompt attention of courts"); *In re Abbott*, 954 F.3d 772, 795 (5th Cir. 2020)

(noting that "[i]t is hard to imagine a more urgent situation" given "the

unprecedented circumstances now facing our society"); *Adams & Boyle, P.C. v.*

*Slatery*, 956 F.3d 913, 918 (6th Cir. 2020) (describing how COVID-19 presents a

"public health crisis" that has "upended American economic and social life"); *Tully*

*v. Okeson*, 977 F.3d 608, 618 (7th Cir. 2020) (calling COVID-19 "the most severe

public-health crisis of the past century," which "currently ravages our nation and

the world"); *Swain v. Junior*, 961 F.3d 1276, 1280 (11th Cir. 2020) (observing that

"[i]t would be a colossal understatement to say that the COVID-19 pandemic has

had far-reaching effects").

 If the COVID-19 pandemic does not represent exceptional circumstances for

the purpose of Petitioners' bail applications, then it is hard to imagine what can.

Indeed, in *Woodcock*, this Court recognized a "health emergency" as an

"exceptional circumstance." 470 F.2d at 94. A deadly virus has lodged itself in the

United States. Petitioners are unable to socially distance so as to prevent

transmission of that virus, and the Government has been deliberately indifferent to

the risk that Petitioners might be infected and could die.

Alternatively, exceptional circumstances can be established by the risk of "serious deterioration of health while incarcerated." *Lacy*, 643 F.2d at 285. Here, the combination of the pandemic and Petitioners' serious comorbidities give rise to such a risk. *See* Supp. App'x 1 (Mr. da Graca), 5 (Mr. Lewis), 14 (Mr. Guillermo), 30 (Mr. Daskalov), 48 (Mr. Lopez), 59 (Mr. Prado, Jr.), 81 (Mr. Kayitare), 101 (Mr. de la Paz), 103 (Mr. Amado), 105 (Mr. Williams), 142 (Mr. Martins); *see also infra* pp. 22-23. There are therefore exceptional circumstances necessitating Petitioners' release.

### C.    The District Court Abused Its Discretion by Failing to Provide Any Justification for Denying Petitioners' Bail Applications

Finally, the district court also palpably erred and abused its discretion in denying Petitioners' bail applications without providing any justification for doing so. "[B]ail may not be denied 'without the application of a reasonably clear legal standard and the statement of a rational basis for denial.'" *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010); *accord Atkins v. Michigan*, 644 F.2d 543, 549 (6th Cir. 1981). The absence of reasons "renders any meaningful review impossible and violates the basic norms of judicial decisionmaking, which require that decisions generally be reached through reasoned argument, not by fiat." *Id.*; *cf. also* Fed. R. App. P. 9(a)(1) (requiring a district court to give "the reasons for an

order regarding the release or detention of a defendant in a criminal case); *United States v. McKenzie*, 318 F. App'x 202, 203 (4th Cir. 2009) (district court's failure to provide reasoning for its determination of whether to grant a motion reducing a criminal sentence was an abuse of discretion)..

Here, even if it were proper for the district court to analyze Petitioners' individual circumstances—including whether they may be flight risks or dangers to the community—the district court erred by denying their bail applications without providing any explanation for why each Petitioner failed to meet the standard adopted by the district court. The urgency of the pandemic might have justified a delay in that explanation, but not its total absence.

Moreover, as explained further below, because Petitioners suffer comorbidities that put them at higher risk of serious harm or death should they contract COVID-19, have significant ties to the community and other equities, and would not pose a flight risk or danger to the community, the district court should have released them on bail.

1.    *Petitioners' Serious Personal Health Conditions*

Petitioners have serious health issues that necessitate release during the pandemic. For example, Mr. da Graca █████████████████████████████ ████████████████████████████████████████████████. *See* Supp. App'x 1, 138–39. Mr. Prado, Jr. ██████████████████████

███████████████████████████████████

███████████████ *See id.* at 59, 143. Mr. Williams ███████

███████████████████████████████████

████████████████████ *See id.* at 105, 145. Mr. Lewis has █

██████████████████████ *See id.* at 5, 141. Mr. Amado ███

███████████████████████████████ *See id.* at 103. Mr.

Daskalov █████████. *See id.* at 30. Mr. Lopez ████████████████████.

*See id.* at 48, 142. Mr. Kayitare ███████████████████

████████████████████. *See id.* at 81. Mr. Guillermo ██████████

██████████████████████████████. *See id.* at 14, 140.

Mr. de la Paz █████████████. *See id.* at 101, 139. Mr. Martins █

███████████████████████████████ *See id*. at 142.

### 2.    *Petitioners' Ties to the Community*

Most Petitioners have lived in the United States for an extended period and have close U.S. relatives they should be permitted to live with and support instead of being incarcerated during a once-in-a-century pandemic. Mr. Amado has lived in the United States for thirty-six years. He provides financial support to his two children, who are U.S. citizens. *See id.* at 104. Mr. Lopez has lived in the United States for thirty-two years. When he was in the community, he resided with his mother, brother, niece and two nephews in New Bedford, Massachusetts. *See id.* at

48. Mr. da Graca has lived in the United States for thirty years. His mother,

brothers, four children, and grandparents live in Rhode Island. *See id.* at 1. Mr.

Prado, Jr. has lived in the United States for twelve years. His wife and two children

live in Brockton, Massachusetts. *See id.* at 59. Mr. Guillermo has lived in the

United States for twenty-eight years. His three children all live in Massachusetts.

*See id.* at 14. Mr. Lewis has lived in the United States for sixteen years. His

fiancée, three children, stepmother, and aunt are U.S. citizens. *See id.* at 5. Mr.

Williams has lived in the United States for thirty-five years. His daughter, mother,

and five siblings are all U.S. citizens. *See id.* at 105. Mr. de la Paz has lived in the

United States for ten years. He resides with his two U.S. citizen brothers. *See id.* at

101. Mr. Okoli has lived in the United States for nine years. He worked two jobs to

provide for his wife and three stepchildren, who are U.S. citizens. *See id.* at 7. Mr.

Daskalov has lived in the United States for seven years. He has two young children

in the United States, one of whom he has never met due to his detention. *See id.* at

30.

> 3.     *Other Equitable Factors Weighing in Petitioners' Favor*

Petitioners have other equities supporting their release pending final

determination on their habeas claims. For example, many have high chances of

success in their immigration cases. ██████████████████████████

████████████████████████████████████████. *See id.* at 5.

. *Id.* at 141.

See id. at 81. And,

. *Id.* at 145.

Therefore, if the district court had adequately addressed Petitioners'

individual circumstances, it should have released them.

### D. There Are Special Risks of Irreparable Harm if Mandamus Is Not Granted

There are several "special risk[s] of irreparable harms" to the Petitioners if

the writ of supervisory mandamus is not granted, including violations of

Petitioners' constitutional rights, threats to their physical health, and illegal

deprivations of their liberty. *In re Grand Jury Subpoena*, 909 F.3d at 28.

An irreparable harm is one "that cannot be adequately compensated for

either by a later-issued . . . injunction, after a full adjudication on the merits, or by

a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397

F.3d 56, 76 (1st Cir. 2005). A violation of a constitutional right itself constitutes an

irreparable harm. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("[t]he loss of

First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury."); *Johnson v. Connolly*, 378 F. App'x 107, 108 (2d

Cir. 2010) (holding, for an alleged constitutional violation based on deliberate

- 25 -

indifference to inmate safety, that "[b]ecause plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary").

Other forms of irreparable harm include the diminution of one's health. *See, e.g.*, *Mass. Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983) ("Termination of benefits that causes individuals to forgo . . . necessary medical care is clearly irreparable injury."). Likewise, "[d]eprivation of physical liberty" through unlawful or unnecessary detention cannot be adequately compensated through damages and therefore also constitutes irreparable harm. *Arevalo v. Hennesy*, 882 F.3d 763, 767 (9th Cir. 2018); *accord United States v. Bogle*, 855 F.2d 707, 710–11 (11th Cir. 1988) ("Unnecessary deprivation of liberty clearly constitutes irreparable harm.").

In this case, Petitioners have already established several irreparable harms, as confirmed by the district court's finding that Petitioners are likely to prove that the Government has detained them with deliberate indifference to a substantial risk of serious harm to them. *See Savino*, 459 F.Supp.3d at 331; *Savino*, 2020 WL 3529664 at *2; Tr., Add. 12. First, this deliberate indifference amounts to a violation of the Fifth Amendment. Such violations of constitutional rights are per se irreparable harms. Second, the district court has found that the Petitioners are likely at "substantial risk of serious harm to their health arising from their conditions of confinement amidst the COVID-19 outbreak." *Id.* at 328. Even where

the virus is not fatal, the harm to Petitioners' health can hardly be compensated through damages. Third, because of the constitutional violations, detention of the Petitioners is illegal. This unlawful deprivation of their liberty, and all consequent harms flowing from that deprivation, are of themselves irreparable harms.

Accordingly, all requirements for supervisory mandamus are satisfied. The district court committed multiple palpable errors, and those errors have led to several special risks of irreparable harm to Petitioners. This Court should grant mandamus.

## II.  IN THE ALTERNATIVE, THE COURT SHOULD ISSUE A WRIT OF ADVISORY MANDAMUS BECAUSE PETITIONERS' DENIAL OF BAIL RAISES IMPORTANT AND NOVEL QUESTIONS THAT ARE LIKELY TO RECUR BUT COULD OTHERWISE EVADE EFFECTIVE REVIEW

If the Court does not issue a writ of supervisory mandamus, it should grant the writ pursuant to its advisory mandamus jurisdiction to clarify that a habeas petitioner need only demonstrate likelihood of success on the merits or exceptional circumstances to be released pending final adjudication on the merits.

### A.  The District Court's Bail Determinations Raise Novel Questions of Substantial Public Importance

The district court's bail determinations raise unsettled questions of substantial public importance, as is required for advisory mandamus. *See Pleau*, 680 F.3d at 4. A question can be sufficiently important if it is of "systemic significance," *Sampson v. United States*, 724 F.3d 150, 159 (1st Cir. 2013), or

raises some "elemental question of judicial authority," *Horn*, 29 F.3d at 770.

There are two unsettled and important questions raised by the district court's bail determinations. First, the Court should clarify that bail is appropriate *either* where a habeas petitioner has shown likelihood of success on the merits *or* where there are exceptional circumstances. *See Glynn*, 470 F.2d at 98. In addition to the district court in this case, since 2019 at least three other district courts within this Circuit, have failed to apply this Court's standard. *See Yanes v. Martin*, 464 F.Supp.3d 467, 469 (D.R.I. 2020); *Boyer v. United States*, No. 14-10163-NMG, 2020 WL 1978190, at *1 (D. Mass. Apr. 24, 2020); *Concepcion v. Hazlewood*, Case No. 18-cv-900-LM, 2019 WL 376389 at *4 (D.N.H. Jan. 9, 2019). Only one has correctly recognized that a petitioner only need to show either likelihood of success or exceptional circumstances. *See United States v. Zimny*, 460 F.Supp.3d 117, 119–20 (D. Mass. 2020). Given these inconsistent applications of First Circuit precedent, it is appropriate for this Court to reaffirm the correct standard.

Second, this Court should confirm that the unprecedented COVID-19 emergency by itself constitutes "exceptional circumstances," especially when petitioners have comorbidities that put them at serious risk of harm or death. While this Court has previously observed that a "health emergency" should be enough to warrant bail, *Woodcock*, 470 F.2d at 94, the district court failed to acknowledge that the pandemic is sufficiently exceptional to release Petitioners on bail.

Both these questions are of substantial public importance. First, they are systemic, because they affect the many detained persons seeking bail or temporary release during the COVID-19 pandemic. Second, they squarely raise questions of judicial authority, given the court's inherent power to grant bail to a habeas petitioner. *See Woodcock*, 470 F.2d at 94. Third, the resolution of these questions bears on the safety of the public at large. As the district court observed, "[t]he virus, if allowed to thrive in the detention centers, will migrate back into our neighborhoods. . . . Were the government to loose an uncontainable viral outbreak from within its detention centers, it would betray its duty to the public, not just to the detainees." *Savino*, 459 F.Supp.3d at 332.

## B.    The Novel Questions Are Likely to Recur

The novel questions raised by these proceedings are also likely to recur. *See Pleau*, 680 F.3d at 4. Many habeas petitioners have and will continue to seek their release from detention pending final adjudication of the merits of their claims, especially as the COVID-19 pandemic continues to ravage the United States and individuals incarcerated within the First Circuit's jurisdiction. *See supra* pp. 26–27.

## C.    Deferral of Review Would Impair Effective Review Later On

Advisory mandamus finally requires that deferral of review of the unsettled question would impair effective review later on. *Pleau*, 680 F.3d at 4. The risk of impairment to further review need only be "appreciable." *Sampson*, 724 F.3d at

- 29 -

161. For example, it is enough to show, even if only "barely," that there is some "impediment" to regular appellate review. *In Re Grand Jury Subpoena*, 909 F.3d at 29.

Here, denying mandamus review would impair future review of the novel questions raised. First, there would be no point to reviewing the district court's bail orders only after final determination of the merits of Petitioners' habeas claims. At such point, the bail applications would be moot. Second, although Petitioners contend that this Court has jurisdiction to hear their collateral appeal from the bail orders, if the Court decides that it does not have jurisdiction, there will be an "appreciable" impediment to appellate review after a final decision on the merits.

Accordingly, the Court should grant a writ of advisory mandamus if it does not grant a writ of supervisory mandamus.

## CONCLUSION

For all the reasons above, Petitioners respectfully request that this Court issue a writ reversing the district court's orders denying bail to Petitioners, and ordering the district court to grant bail to Petitioners.

In the alternative, Petitioners request that this Court issue a writ vacating the district courts' orders denying bail, and remanding to the district court to re-determine Petitioners' bail applications using the correct legal standard.

Dated: November 25, 2020

Respectfully submitted,


/s/ Sameer Ahmed
Sameer Ahmed (1st Cir. No. 1161854)
Harvard Law School Crimmigration Clinic
6 Everett Street
Cambridge, Massachusetts 02138
Telephone: (617) 384-0088
sahmed@law.harvard.edu

## CERTIFICATE OF COMPLIANCE

This petition complies with Federal Rule of Appellate Procedure 21(d)(1) in that, according to the word-count feature of the word-processing program with which it was prepared, the petition contains 7,276 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).


/s/ Sameer Ahmed
Sameer Ahmed


## CERTIFICATE OF SERVICE

On this 25th day of November, 2020, I electronically filed the foregoing using the appellate CM/ECF system.  Pursuant to Federal Rule of Appellate Procedure 21(a)(1), on this 25th day of November, 2020, I also served this petition on all parties to the proceeding in the trial court by e-mail to the following counsel of record for the parties:

Counsel for Defendants:

- Christina Parascandola <CParasca@civ.usdoj.gov>
- Thomas Kanwit <TKanwit@usa.doj.gov>
- Michael Sady <MSady@usa.doj.gov>
- William Silvis <WSilvis@civ.usdoj.gov>

Counsel for Plaintiffs:

- Mike Brown <Mike.Brown@wilmerhale.com>

- 32 -

- Felicia Ellsworth <felicia.ellsworth@wilmerhale.com>
- Oren Sellstrom <osellstrom@lawyersforcivilrights.org>
- Oren Nimni <onimni@lawyersforcivilrights.org>
- Michael Wishnie <michael.wishnie@ylsclinics.org>
- Muneer Ahmad <muneer.ahmad@ylsclinics.org>
- Sara Zampierin <sara.zampierin@YLSClinics.org>
- John Butts <John.Butts@wilmerhale.com>
- Lisa Pirozzolo <Lisa.Pirozzolo@wilmerhale.com>
- Nicole Fontaine Dooley <Nicole.FontaineDooley@wilmerhale.com>
- Annaleigh Curtis <Annaleigh.Curtis@wilmerhale.com>
- Rama Attreya <Rama.Attreya@wilmerhale.com>
- Elizabeth Driscoll <Elizabeth.Driscoll@wilmerhale.com>
- Mikayla C. Foster <Mikayla.Foster@wilmerhale.com>
- Gary B. Howell-Walton <Gary.Howell-Walton@wilmerhale.com>

Pursuant to Federal Rule of Appellate Procedure 21(a)(1), on this 25th day of November, 2020, I also provided a copy of this petition to the trial-court judge by overnight mail at the following address:

Hon. William G. Young
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

/s/ Sameer Ahmed
Sameer Ahmed

- 33 -

# ADDENDUM

Pursuant to Federal Rule of Civil Procedure 21(a)(2)(c), please find

enclosed:

| **Required Materials** | **Page** |
| --- | --- |
| Docket Entries (ECF No. 27, 107, 112, 117, 135, 168, 172) ........................ Add. 1 | |
| Transcript of Hearing (April 3, 2020) …………….......................................... Add. 7 | |
| Order of the U.S. District Court (April 8, 2020) ......................................... Add. 34 | |
| Decision of the U.S. District Court (May 12, 2020) .................................... Add. 63 | |
| Order of the U.S. District Court (Jun. 18, 2020) ......................................... Add. 97 | |

| ENTRY | FILED | PDF | DESCRIPTION |
|-------|-------|-----|-------------|
| | | | Customs Enforcement (ICE), Chad F. Wolf. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Kanwit, Thomas) (Entered: 03/30/2020) |
| 27 | Mar 30, 2020 | Request | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 3/30/2020 via Zoom re 11 MOTION for Temporary Restraining Order filed by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves. The Court hears arguments of counsel and continues the matter to Thursday, April 2, 2020 at 2 PM. The Court expects full disclosure and cooperation with any informal discovery. Affidavits of doctors to be filed; pictures/plans of facility shall be filed in camera for the Court's review. Motion Hearing continued to 4/2/2020 02:00 PM before Judge William G. Young. This hearing will be held via Zoom. (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Nimni and Wishnie for the petitioners; Attorneys Kanwit and Sady for the respondent) (Gaudet, Jennifer) (Entered: 03/30/2020) |
| 28 | Mar 31, 2020 | Request | NOTICE of Appearance by William W. Fick on behalf of Rick Raemisch (Fick, William) (Entered: 03/31/2020) |
| 29 | Mar 31, 2020 | Request | MOTION for Leave to File Declaration as Amicus Curiae by Rick Raemisch. (Attachments: # 1 Proposed Amicus Declaration)(Fick, William) (Entered: 03/31/2020) |
| 30 | Apr 1, 2020 | Request | Opposition re 29 MOTION for Leave to File Declaration as Amicus Curiae filed by Steven J. Souza. (Kanwit, Thomas) (Entered: 04/01/2020) |
| 31 | Apr 1, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered granting 29 Motion for Leave to File Declaration as Amicus Curiae by Rick Raemisch. Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 04/01/2020) |
| 32 | Apr 1, 2020 | Request | Letter from John A. Hawkinson Requesting Expedited Media Access. (Paine, Matthew) (Entered: 04/01/2020) |
| 33 | Apr 2, 2020 | Request | REPLY to Response to 11 MOTION for Temporary Restraining Order filed by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Appendix)(Nimni, Oren) (Entered: 04/02/2020) |

Add. 1

| ENTRY | FILED | PDF | DESCRIPTION |
|---|---|---|---|
| | | | (Additional attachment(s) added on 4/20/2020: # 1 Exhibits two and three, # 2 Exhibits four through six, # 3 Exhibits eight through eleven) (Gaudet, Jennifer). (Entered: 04/19/2020) |
| 101 | Apr 20, 2020 | Request | MOTION for Extension of Time to 4/20/20 10:15 am to File Input List of 10 by Thomas M. Hodgson.(Kanwit, Thomas) (Entered: 04/20/2020) |
| 102 | Apr 20, 2020 | Request | BRIEF by Thomas M. Hodgson Input on List of 10 4 20 2020. (Attachments: # 1 Exhibit 1)(Kanwit, Thomas) (Entered: 04/20/2020) |
| 103 | Apr 20, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered granting 101 Motion for Extension of Time to 4/20/20 10:15 am to File Input List of 10 by Thomas M. Hodgson. (Gaudet, Jennifer) (Entered: 04/20/2020) |
| 104 | Apr 20, 2020 | Request | BRIEF by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves Brf on Individual Applications for Bail. (Sellstrom, Oren) (Additional attachment(s) added on 4/21/2020: # 1 Exhibits one and two, # 2 Exhibits three through five, # 3 Exhibits six through eight, # 4 Exhibits nine through eleven) (Gaudet, Jennifer). (Entered: 04/20/2020) |
| 105 | Apr 21, 2020 | View | BRIEF by Thomas M. Hodgson Input on April 21 2020 List. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Kanwit, Thomas) (Entered: 04/21/2020) |
| 106 | Apr 21, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered granting 99 Motion for Leave to Appear Pro Hac Vice. Added Muneer Ahmad. Attorneys admitted Pro Hac Vice must register for electronic filing if the attorney does not already have an ECF account in this district. To register go to the Court website at www.mad.uscourts.gov. Select Case Information, then Electronic Filing (CM/ECF) and go to the CM/ECF Registration Form. (Paine, Matthew) (Entered: 04/21/2020) |
| 107 | Apr 21, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered. In Accordance with this Court's terms and conditions of bail as set forth in paragraph 2 of its April 4, 2020 Order (ECF No. 44), and as modified at the hearing held on April 9, 2020 to permit ICE in its discretion to include electronic monitoring as a condition of bail, the following detainee shall be submitted to bail and released forthwith: Valentim, Lucas. The release of Smith, Cordel and Lopez Rodriguez, Geremias on bond means they drop out of the class. Da Graca, Aires and Williams, Keith are denied bail. The matter of bail is taken under advisement as to other detainees on the April 20, 2020 list.(Gaudet, Jennifer) (Entered: |

Add. 2

| ENTRY | FILED | PDF | DESCRIPTION |
|---|---|---|---|
| | | | 04/21/2020) |
| 108 | Apr 21, 2020 | Request | Judge William G. Young: ORDER entered. (Gaudet, Jennifer) (Entered: 04/21/2020) |
| 109 | Apr 21, 2020 | Request | NOTICE by Steven J. Souza of Additional Detainees (Kanwit, Thomas) (Entered: 04/21/2020) |
| 110 | Apr 22, 2020 | Request | BRIEF by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves Brf on Individual Applications for Bail. (Sellstrom, Oren) (Additional attachment(s) added on 4/22/2020: # 1 Exhibits one and two, # 2 Exhibits four and five, # 3 Exhibits six through eight, # 4 Exhibits nine and ten) (Gaudet, Jennifer). (Entered: 04/22/2020) |
| 111 | Apr 22, 2020 | Request | BRIEF by Thomas M. Hodgson April 22 List. (Attachments: # 1 Exhibit 1)(Kanwit, Thomas) (Entered: 04/22/2020) |
| 112 | Apr 22, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered. The following detainees are denied bail: Castillo-Martinez, Jairon; Daskalov, Dimitar; Lewis, Conroy; Martins, Edson; Prado Junior, Flavio.(Gaudet, Jennifer) (Entered: 04/22/2020) |
| 113 | Apr 22, 2020 | Request | NOTICE by Steven J. Souza of Intent to Transfer (Kanwit, Thomas) (Entered: 04/22/2020) |
| 115 | Apr 23, 2020 | Request | BRIEF by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves Brf on Individual Applications for Bail. (Attachments: # 1 Exhibit Exhibit 11)(Sellstrom, Oren) (Additional attachment(s) added on 4/27/2020: # 2 Exhibits one and two, # 3 Exhibits three through five, # 4 Exhibits six through eight, # 5 Exhibits nine and ten) (Gaudet, Jennifer). (Entered: 04/23/2020) |
| 116 | Apr 23, 2020 | Request | BRIEF by Thomas M. Hodgson Input on April 23 List. (Attachments: # 1 Exhibit 1)(Kanwit, Thomas) (Entered: 04/23/2020) |
| 117 | Apr 23, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered. The release of De Sousa Caldas, Jose on bond means he drops out of the class. Amado, Joao; Guillermo, Darlin Alberto; Kayitare, Fred; Menjivar Rojas, Carlos Dalelio and Okoli, Cyril are denied bail. The matter of bail is taken under advisement as to other detainees on the April 22, 2020 list.(Gaudet, Jennifer) (Entered: 04/23/2020) |
| 118 | Apr 23, 2020 | View | MOTION to Modify Release Terms by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves.(Sellstrom, Oren) (Entered: 04/23/2020) |

Add. 3

| ENTRY | FILED | PDF | DESCRIPTION |
|---|---|---|---|
| | | | (Entered: 04/24/2020) |
| 127 | Apr 24, 2020 | Request | NOTICE of Appearance by Rama S. Attreya on behalf of Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves (Attreya, Rama) (Entered: 04/24/2020) |
| 128 | Apr 24, 2020 | Request | NOTICE of Appearance by Gary B. Howell-Walton on behalf of Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves (Howell-Walton, Gary) (Entered: 04/24/2020) |
| 129 | Apr 24, 2020 | Request | NOTICE of Appearance by Nicole M.F. Dooley on behalf of Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves (Dooley, Nicole) (Entered: 04/24/2020) |
| 130 | Apr 27, 2020 | Request | BRIEF by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves Brf on Individual Applications for Bail. (Sellstrom, Oren) (Entered: 04/27/2020) |
| 131 | Apr 27, 2020 | Request | BRIEF by Thomas M. Hodgson Regarding April 27 List. (Attachments: # 1 Exhibit 1)(Kanwit, Thomas) (Entered: 04/27/2020) |
| 133 | Apr 27, 2020 | Request | Set/Reset Deadlines as to motion for preliminary injunction. Motion Hearing set for 5/7/2020 10:00 AM by video 18 before Judge William G. Young. (Gaudet, Jennifer) (Entered: 04/27/2020) |
| 134 | Apr 27, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered. Tep, Samnang is denied bail; all other detainees on the list for April 23, 2020 remain pending and under advisement. (Gaudet, Jennifer) (Entered: 04/27/2020) |
| 135 | Apr 28, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered. In Accordance with this Court's terms and conditions of bail as set forth in paragraph 2 of its April 4, 2020 Order (ECF No. 44), and as modified at the hearing held on April 9, 2020 to permit ICE in its discretion to include electronic monitoring as a condition of bail, the following detainee shall be submitted to bail and released forthwith: Cruz Soares, Geraldo. The following detainees are denied bail: Delapaz, Gabri, Lopez-Gonzalez, Emmanuel and Bassyouni, Mohamad. The matter of bail is taken under advisement as to Amador Galindo, Diego and Blanco, Bacilio.(Gaudet, Jennifer) (Entered: 04/28/2020) |
| 136 | Apr 29, 2020 | Request | NOTICE of Appearance by Muneer I. Ahmad on behalf of Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves (Ahmad, Muneer) (Entered: 04/29/2020) |

Add. 4

| ENTRY | FILED | PDF | DESCRIPTION |
|---|---|---|---|
| | | | Exhibit 1 Souza decl., # 2 Exhibit 2 CDC Guidance, # 3 Exhibit 3 3 11th Cir. Swain decision, # 4 Exhibit 4 Barco decision, # 5 Exhibit 5 Jenkins decision, # 6 Exhibit 6 ICE A dimensions, # 7 Exhibit 7 Mods dimensions) (Kanwit, Thomas) (Entered: 05/06/2020) |
| 165 | May 6, 2020 | Request | NOTICE by Steven J. Souza of Transfer Out of Bristol (Kanwit, Thomas) (Entered: 05/06/2020) |
| 166 | May 6, 2020 | Request | MOTION to Compel Discovery Responses by Thomas M. Hodgson.(Kanwit, Thomas) (Entered: 05/06/2020) |
| 167 | May 7, 2020 | Request | NOTICE by Steven J. Souza of Intent to Transfer Out (Kanwit, Thomas) (Entered: 05/07/2020) |
| 168 | May 7, 2020 | Request | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing re motion for preliminary injunction held on 5/7/2020 by video. The Court hears arguments of counsel and enters an order concluding that on the record before the Court a preliminary injunction is fully warranted and requires that as soon as reasonably possible all detainees and staff be tested, with FDA approved test, for COVID-19 at no cost to them. No new detainees to be admitted to this detention facility. See transcript for details. Said order takes effect forthwith. Written order to issue, with the Court reserving his right to enter additional preliminary injunction orders. The parties may at anytime seek modifications. The Court recites analysis and findings for preliminary injunction order. (Court Reporter: Richard Romanow at bulldog@richromanow.com.) (Attorneys present: Attorneys Sellstrom, Wishnie, Pirozzolo and Butts for the plaintiffs and Ausa Kanwit for the defendant) (Gaudet, Jennifer) (Entered: 05/08/2020) |
| 169 | May 9, 2020 | View | BRIEF by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves Request re Imminent Transfers. (Sellstrom, Oren) (Additional attachment(s) added on 5/11/2020: # 1 Exhibit) (Gaudet, Jennifer). (Entered: 05/09/2020) |
| 170 | May 11, 2020 | Request | Opposition re 166 MOTION to Compel Discovery Responses filed by Thomas M. Hodgson. (Kanwit, Thomas) (Entered: 05/11/2020) |
| 171 | May 11, 2020 | Request | ELECTRONIC NOTICE of Hearing. Hearing re 169 BRIEF by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves Request re Imminent Transfers set for 5/11/2020 11:30 AM by video before Judge William G. Young. This hearing will be conducted by video conference. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the |

Add. 5

| ENTRY | FILED | PDF | DESCRIPTION |
|-------|-------|-----|-------------|
| | | | technology, please notify the session's courtroom deputy as soon as possible.Access to the hearing will be made available to the media and public. In order to gain access to the hearing, you must sign up at the following address: www.public.mad.uscourts.gov/seat ing-signup. For questions regarding access to hearings, you may refer to the Court's general orders and public notices available on www.mad.uscourts.gov or contact media@mad.uscourts.gov.(Gaudet, Jennifer) (Entered: 05/11/2020) |
| 172 | May 11, 2020 | Request | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Hearing held on 5/11/2020 by video. The Court addresses counsel re 169 request re imminent transfers. The Court modifies the preliminary injunction as follows to the extent ICE seeks to remove an individual detainee: No individual shall be moved until the testing for Covid-19 has been performed and the Court informed of the results. If an individual declines to be tested then the individual may be moved so long as it is compliant with ICE internal protocols. The government moves to stay entry of modification - the Court denies the request. Further briefing regardif outstanding issues raised by the plaintiff is welcomed. The Court will further reflect on the pending motion for discovery. (Court Reporter: Richard Romanow at bulldog@richromanow.com.)(Attorneys present: Attorneys Sellstrom, Wishnie and Butts for the plaintiff and Attorney Kanwit for the defendant) (Gaudet, Jennifer) (Entered: 05/11/2020) |
| 173 | May 11, 2020 | Request | MOTION Expedited Response to Motion to Compel by Thomas M. Hodgson.(Kanwit, Thomas) (Entered: 05/11/2020) |
| 174 | May 11, 2020 | Request | STATEMENT OF COUNSEL re 173 MOTION Expedited Response to Motion to Compel by Maria Alejandra Celimen Savino, Julio Cesar Medeiros Neves. (Sellstrom, Oren) (Entered: 05/11/2020) |
| 175 | May 12, 2020 | View | Judge William G. Young: ORDER entered. MEMORANDUM OF DECISION(Sonnenberg, Elizabeth) (Entered: 05/12/2020) |
| 176 | May 12, 2020 | Request | Judge William G. Young: ELECTRONIC ORDER entered re 173 MOTION Expedited Response to Motion to Compel filed by Thomas M. Hodgson. The Court requires a copy of the interrogatories sought to be enforced. (Gaudet, Jennifer) (Entered: 05/12/2020) |
| ∨ | | Click to expand 156 unmatched entries | |

Add. 6

1                    UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS (Boston)

3
                                    No. 1:20-cv-10617-WGY
4

5    MARIA ALEJANDRA CELIMEN SAVINO, et al
                         Petitioners,
6    v.

7    THOMAS M. HODGSON, et al
                    Respondents.
8

9
                                    No. 1:20-cv-10644-WGY
10

11   DARCY G. McMENAMIN, et al
                        Petitioners,
12   v.

13   STEVEN J. SOUZA, et al,
                    Respondents.
14

15                      * * * * * * * * *

16

17       For Continued Video (Zoom) TRO Hearing Before:
                    Judge William G. Young

18
                         United States District Court
19                       District of Massachusetts (Boston)
                         One Courthouse Way
20                       Boston, Massachusetts 02210
                         Friday, April 3, 2020
21

22                      * * * * * * * *

23           REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
24              United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
25                  bulldog@richromanow.com

```
 1              A P P E A R A N C E S

 2

 3   OREN M. SELLSTROM, ESQ.
        Lawyers' Committee for Civil Rights
 4      and Economic Justice
        61 Batterymarch Street, 5th Floor
 5      Boston, MA 02110
        (617) 988-0608
 6      Email: Osellstrom@lawyerscom.org
     and
 7   MICHAEL J. WISHNIE, ESQ.
        Yale Law School
 8      127 Wall Street
        New Haven, CT 06511
 9      (203) 436-8971
        Email: Reena.parikh@ylsckinics.org
10      For Petitioners (Savino, et al)

11   DANIEL L. McFADDEN, ESQ.
        American Civil Liberties Union
12      211 Congress Street
        Boston, MA 02110
13      (617) 482-3170
        Email: Dmcfadden@aclum.org
14      For Petitioners (McMenamin, et al)

15   THOMAS E. KANWIT, ESQ.
     MICHAEL SADY, ESQ.
16      United States Attorney's Office
        1 Courthouse Way, Suite 9200
17      John Joseph Moakley Federal Courthouse
        Boston, MA 02210
18      (617) 748-3271
        Email: Thomas.kanwit@usdoj.gov
19      For Respondents (Savino, et al)

20   RAYMOND A. FARQUHAR, ESQ.
        United States Attorney's Office
21      1 Courthouse Way, Suite 9200
        Boston, MA 02210
22      Email: Rayford.farquhar@usdoj.gov
        Boston, MA 02210
23      (617) 748-3100
        Email: Rayford.farquhar@usdoj.gov
24      For respondents (McMenamin, et al)

25
```

```
 1          P R O C E E D I N G S
 2          (Begins, 2:30 p.m.)
 3          HE CLERK:  Now hearing Civil Matter 20-10617,
 4   Savino vs. Hodgson and Civil Action 20-10644, McMenamin,
 5   et al vs. Sousa.
 6          THE COURT:  Good afternoon, counsel.  Again at the
 7   outset, since we're in remote locations, I'll recite
 8   that this video conference is hosted by the Courtroom
 9   Deputy Clerk, Ms. Jennifer Gaudet, these proceedings are
10   transcribed by our Official Court Reporter, Richard
11   Romanow, there may be press or public on the line, and
12   they are reminded that the Court rules remain in full
13   force and effect and that these proceedings are not to
14   be taped or rebroadcast.
15          With that said, let's have counsel identify
16   themselves who expect to speak or to be called upon to
17   speak, and we'll start with the petitioner in the Savino
18   case.
19          MR. SELLSTROM:  Good afternoon, your Honor, Oren
20   Sellstrom from Lawyers for Civil Rights on behalf of the
21   Savino petitioners.
22          MR. WISHNIE:  Good afternoon, your Honor, Michael
23   Wishnie, Yale Law School, also for petitioners.
24          THE COURT:  Thank you.
25          MR. KANWIT:  Good afternoon, your Honor, Thomas
```

```
 1    Kanwit on behalf of the defendants/respondents.
 2           THE COURT:  Thank you.
 3           And in the McMenamin matter?
 4           MR. McFADDEN:  Good afternoon, your Honor, Dan
 5    McFadden, American Civil Liberties of Massachusetts, on
 6    behalf of the petitioners.
 7           THE COURT:  Thank you.
 8           MR. FARQUHAR:  Ray Farquhar for the government,
 9    your Honor, with regard to the McMenamin and Portillo
10    matter.
11           THE COURT:  Thank you.
12           Now, at the outset I believe that I have read all
13    the materials while -- within 15 minutes of the
14    commencement of this proceeding, and I'm very grateful
15    for them.  Specifically I want to address the
16    substantive letter -- well it's a brief and that's
17    certainly substantive, but I want to address the letter
18    that Mr. Kanwit has filed on behalf of the respondents,
19    ICE.  But my question -- I much appreciate it.  It shows
20    that the -- these proceedings, um, people are
21    understanding the Court's concerns and I'm very
22    grateful.  I mean that sincerely.  But my first question
23    must be to Mr. Sellstrom.
24           In earlier proceedings, as we have discussed these
25    matters and I have outlined the restrictions, if anyone
```

```
1    was to be released under my habeas corpus authority, I
2    understood you to think that in some respects they might
3    be too, um, much of a restriction.  Here now certain
4    individuals are being released by ICE, and, um, I
5    express my appreciation for that.  The terms are set
6    forth in the letter.  And, um, I would take it --
7         But you tell me, Mr. Sellstrom, are those terms
8    sufficient were this Court to order other people
9    released?
10        MR. SELLSTROM:  Your Honor, we believe that any
11   conditions that ICE would place upon that would be
12   appropriate.  So your Honor outlined, certainly in the
13   last hearing, some conditions that I believe, um, as I
14   understood your Honor was saying would apply to every
15   member of the class who was granted relief.  But to the
16   extent that there are additional conditions that ICE
17   would want to place on any class member, um, as we said,
18   previously that would be fine with us, ranging all the
19   ways towards, you know, electronic monitoring and home
20   detention and whatever tools ICE has on that score.  So
21   any of those are fine.  I have no objection to any of
22   the conditions in the letter.
23        THE COURT:  I appreciate that.  Well that --
24   acknowledging that then, the action of ICE has mooted
25   this case with respect to those six petitioners and the
```

1  Court will say nothing further with respect to them.

2      Dealing only then with Group 1, and only in the

3  Savino case, um --

4      Well, Mr. Kanwit, I should turn to you.  I take

5  it -- your letter is very clear, but that's as far as

6  we're going in terms of any agreement.  Isn't that

7  right, Mr. Kanwit?

8      MR. KANWIT:  That is correct, your Honor.

9      THE COURT:  Thank you.  Thank you.  And I so

10  understood it.  So what said now is entirely on my

11  responsibility.

12      The Court, having carefully considered the issues

13  and the individuals in Group 1, um, concludes that it

14  has the authority, um, to act under its inherent

15  authority to grant or deny habeas corpus.

16      The standard, um, that I must follow is that

17  touched on -- not fully explicated and I mean no

18  disrespect, but touched on by the First Circuit in

19  *Woodcock v Donnelly*, and to the extent that the First

20  Circuit requires a finding to invoke habeas corpus in

21  these circumstances, a reasonable likelihood of success,

22  I do make that finding.  I base that finding on the

23  extensive spread of the Covid-19 virus throughout

24  Massachusetts.

25      I recognize that there has been no, um, positive

1  tests of detainees.  I recognize the situation of the

2  nurse who did test positive and her limited involvement

3  with detainees.  Nevertheless, as I have said earlier,

4  and I do now find, that the risk of an outbreak of

5  Covid-19 among these detainees in conditions where --

6  what we are taught is appropriate spacing, cannot -- and

7  I don't mean this critically of the Sheriff, but cannot

8  be maintained, is such to satisfy the *Woodcock* standard.

9       I also draw authority, as my colleague Judge Wolf

10  did, from the Second Circuit decision in *Matt v. Reno*,

11  which does not impose such a required finding, but does

12  outline the basis for this Court's action.  More

13  specifically, I am following in the steps of my

14  colleague Judge Wolf in his *Jiminez* decision, and also

15  the well-considered -- Judge Wolf's opinion is well-

16  considered as well, but the well-considered opinion of

17  Judge Oetken in the Southern District, and the citation

18  is *Hernandez vs. Decker*, 20cv1589, JPO, 2020 Westlaw,

19  1547459 Southern District of New York, April 1, 2020,

20  two days ago.  So the Court has authority.

21       How shall the Court address or deal with that

22  authority in these particular cases?  The Court now

23  rules and direct as follows.

24       The petition of Mohamad Bassyouni is denied

25  without prejudice to it being, um -- a further petition

1   being filed and addressed on a more thorough briefing

2   schedule, which briefing schedule will be presented to

3   the court no later than Wednesday of next week.

4       The petition of Gersen McGlashin is continued with

5   the respondents, required by the close of business on

6   Monday, to provide a detailed explanation of just how

7   they're going to execute the final removal order within

8   the next two weeks, that is where's he going to go?  How

9   is he going to be transported there?  And I've got to be

10  assured that in fact he'll be removed from the

11  population and deported in accordance with the, um,

12  appropriate determination.

13      The case of Jessie Maina is continued and now the

14  burden is on petitioner's counsel, by Friday next -- the

15  close of business by Friday next, to provide the Court

16  with a detailed plan, were he to be released, where he

17  would reside?  With whom he would reside?  Who would be

18  his custodian, who would agree to be his custodian?

19  What is their relationship to him?

20      With respect to the cases of Henrry Urbina-Rivas,

21  Robson Maria-de Oliveira, and Jervis Vernon, the Court

22  grants the writ of habeas corpus, they are to be

23  released forthwith on the following terms.  All the

24  terms and conditions that the, um, ICE has already put

25  on these other people and the following terms and

1  conditions.

2      They are:  When they are released, they are to be

3  released into an acceptable custodian, who -- which

4  custodian -- not taxis or buses, which custodian will

5  pick them up outside the facility by car.  There are no

6  restrictions and I've investigated this, executive

7  orders restricting the rights of travel.  And they are

8  then to be taken from the facility to a place of

9  residence.  Obviously that place of residence is to be

10  provided to ICE and ICE will in turn notify the state

11  and local law enforcement authorities.

12      Once they're there they are to quarantine

13  themselves for 14 days from the day they in fact leave

14  the detention facility.  That's a full quarantine, they

15  are not to leave the house for any reason.

16      Thereafter they remain under house arrest without

17  electronic monitoring.  They are not to leave, save to

18  attend immigration proceedings or to attend -- excuse

19  me, to attend to their own medical needs should those

20  needs be so severe that they have to actually go to a

21  doctor's office or to a hospital.

22      Having been released under this habeas order, they

23  are not to be arrested by ICE officers unless any terms

24  of their release -- there's probable cause to believe

25  that any terms of their release are violated, and then

1    only on a warrant by a federal magistrate or a federal

2    district judge, or should there be a final order of

3    removal that is presently executable -- as the

4    government maintains that it -- in the case of

5    Mr. McGlashin, that there's a final order and he can be

6    removed, the person can be removed within the next two

7    weeks, that's a basis for a federal officer removing

8    him.

9         Now that's the order of the court as to Group 1.

10   We'll stop and my next question will be to Mr. Farquhar,

11   but before I go on, I should stop and ask if there are

12   any questions?  This is not the time for argument, but

13   it is the time for questions.  And we'll start with

14   Mr. Sellstrom.

15        MR. SELLSTROM:  No questions as to the group that

16   you just outlined, your Honor.  We did have the other

17   question of Ms. Savino and whether or not she is

18   appropriately in Subclass 1.

19        THE COURT:  I understand that, and I simply have

20   not spoken it, Mr. Sellstrom.  Very recently now there's

21   been a motion to dismiss her entirely as a petitioner,

22   the gravamen being she is properly before Judge Saris.

23   So I simply haven't spoken to it.  But no questions as

24   to what I've just said?

25        MR. SELLSTROM:  No, your Honor.

```
 1          THE COURT:  Mr. Kanwit, just questions, sir.
 2          MR. KANWIT:  I understand, your Honor, I'm not
 3     going to argue, although it's always tempting.
 4          THE COURT:  And it's usually welcome.  We'll get
 5     to argument.  But, um, really, because as a practical
 6     matter, have I made myself clear?
 7          MR. KANWIT:  You have, your Honor.  The one
 8     question I have, and before I get to it, I do want to
 9     acknowledge that the Court has clearly given this a lot
10     of thought, and I greatly appreciate that, as well as I
11     appreciate your, um, willingness and grace in accepting
12     submissions that I was unable to file earlier.  As I
13     think you probably suspect, we've been working very
14     hard, as I know plaintiff's counsel have, and we've made
15     every effort to get you things as quickly as we could,
16     but the Court's been great in reviewing what we've
17     submitted.
18          That having been said, your Honor, the one
19     question I have with regard to the Court's ruling on
20     Group 1 when is the release going to happen, um, for the
21     three individuals as to whom we don't have an agreement
22     but a court has ordered their release?
23          THE COURT:  My expectation -- that's a good
24     question and it's a practical matter.
25          I assume as to the ones who, as an administrative
```

1   process you're processing to release, these three would
2   be processed likewise.  That's what I expect.
3   "Forthwith" means with all reasonable, um, facility
4   consistent with practicality.  Someone has to drive out
5   to the facility and get them.  I don't -- your good
6   faith has been demonstrated throughout.  I don't see a
7   problem.  But I need those details worked out.
8         MR. KANWIT:  Thank you, your Honor.
9         THE COURT:  Did I answer it?
10        MR. KANWIT:  It does, your Honor.
11        THE COURT:  All right.
12        Now, Mr. Farquhar, I could turn to Mr. McFadden,
13  but I'll turn to you.
14        What if anything has been worked out as to the two
15  whom you are most concerned with?
16        MR. FARQUHAR:  Thank you, your Honor.
17        Well your Honor yesterday laid out the five
18  groupings for the detainees, um, and your Honor stated
19  that, um, you believed that Mr. Portillo would fall
20  under Group 4 and that Mr. McMenamin would fall under
21  Group 5, and in, um -- we have looked at both of their
22  situations under that, you know the guideline that you
23  provided through the various groups.
24        That being said, over the past 24 hours I've had
25  extensive conversations -- most of them just in the last

1  couple of hours, with both the facility and with ICE.

2  And this is what I think we are prepared to offer, if

3  the Court would indulge me.

4      With regard to both individuals, we certainly

5  understand the Court's concern about social distancing

6  and trying to keep these two individuals, who may have a

7  higher risk level than other detainees, somewhat

8  separated from the general detainee population.  That

9  being said, what we would be capable of doing is that

10  each cell has approximately 6 to 8 bunk beds in a cell.

11  A cell might be approximately 10 feet by 30 feet.

12      It's my understanding with the, um, current

13  capacity of the facility, that we're in position to be

14  able to place both Mr. Portillo and Mr. McMenamin into a

15  single cell of 10 by 30 and so they would be the only

16  two individuals in that cell.

17      They would have a choice, for a meal, to either

18  be, um, to first, each day, for each meal, to go down to

19  have their meal, and then that meal can be taken back to

20  that -- to their rooms, which have a -- they're kind of

21  a, um, like dormitory-styled rooms, and so they have a

22  door that closes, so they can either eat in their rooms

23  or there is another location where they can eat and it's

24  more of a private room that can be limited to the

25  individuals that are in that room.

```
 1         And so both individuals will be placed under that
 2    category where they are given the opportunity --
 3    something similar to what, um, we see happening in
 4    supermarkets where elderly folks are allowed to go at
 5    certain hours, what we would do is try to set the time
 6    frame so they can get to the lunch line, the breakfast
 7    line, the dinner line first, and either go to their
 8    separate room or go back to their rooms.  And so what
 9    we're trying to do is, um, there's a room for meals, if
10    they don't want to eat in the same room they are
11    staying.
12         And so what we're trying to do is offer a
13    compromise whereby they are significantly limited to
14    interacting with the population, which is again being
15    greatly diminished at the facility, which will lesson
16    their exposure to other individuals.
17         THE COURT:  Thank you.
18         Mr. McFadden, are you hearing this for the first
19    time?
20         MR. McFADDEN:  Yes, your Honor, we did speak
21    earlier today, but Mr. Farquhar was still in discussions
22    with his clients.  This is the first time I have heard
23    this information.
24         THE COURT:  How does that suit?
25         MR. McFADDEN:  Your Honor, I think that this is a
```

1    proposal that I will need to present to my clients and
2    then receive instructions.  If I may have some time to
3    do that?

4         THE COURT:  How much time do you want?

5         MR. McFADDEN:  Your Honor, I think if I could
6    respond no later than perhaps noon on Monday, would that
7    be sufficient?

8         THE COURT:  It is.  It is.  So the matter -- I'm
9    not contemplating another hearing, but, um, you can
10   certainly ask for it.  But I would like the response by
11   noon on Monday.

12        All right.  And, Mr. Farquhar, I do thank you, and
13   I thank you, Mr. McFadden.

14        Now here's what I want to do.  I want a list of 50
15   more names and, um, I'm not saying that I am disposed to
16   release 50 or release any particular number.  But I want
17   50.

18        It must be obvious the premise on which I'm
19   operating, that the fewer that are in there -- again no
20   criticism of the Sheriff, who has kept the place free of
21   Covid so far.

22        I will tell you I'd be interested, and
23   Mr. Farquhar spoke to it in a way.  If anyone has an
24   idea how a 6-foot separation protocol could work in a
25   facility like that, how many people could be in a

1    facility with a 6-foot separation protocol much like --

2    one always errs when one makes reference to personal

3    experience, but I have been out on occasion to get food

4    and go to the supermarket and I see what they're doing.

5        Now, um, I'd be interested to know how many and

6    what the parties think about that.  But I want a list of

7    50.  And here's how I propose to proceed.

8        I want the list of 50 by the close of business

9    tomorrow, and the list of 50 is, um, without regard to,

10   um, my groupings, my classes or subclasses, it is

11   candidly an attempt now to expand the focus and see what

12   else can be worked out, if anything, but it is not the

13   function of this Court to micromanage the detention

14   facility or ICE's priorities, and I'm seeking not to do

15   it.  I'd like you to agree on the 50.

16       The 50 is just -- and in this respect I -- there's

17   much to what Mr. Kanwit says, I have to deal with these

18   people individually, and even under Group 1 where I

19   thought there were not parameters that would call out

20   people individually, I've come to see that there are

21   some concerns that require individual scrutiny by the

22   court.

23       So by let's say -- well let's say 4:00 tomorrow.

24   4:00 tomorrow.  And I know it's the weekend.  I'd just

25   like the list.  And I'd like the list of the order in

1   which you people would like these individuals

2   considered.

3       Now maybe, Mr. Sellstrom, Mr. Kanwit, I'm asking

4   too much, though your good faith on both sides has been

5   amply demonstrated and I'm frankly saying I'm grateful

6   for it.  Here's the advantage to you.

7       If you don't give me 50 names and you don't give

8   them to me in order, I'll pick and you won't know who

9   they are then until 4:00 on Sunday afternoon when I will

10  enter an order saying, "These are the next 50 that the

11  Court wants to consider," and the way we'll consider

12  them is like this, we'll consider 10 a day starting on

13  Tuesday.

14      I don't propose oral hearings, I don't think I

15  need oral hearings.  I do propose as thorough a briefing

16  as I can as to -- in the face of this Covid-19 epidemic

17  and all the considerations that have been raised in the

18  hearing and the skillful briefing that's gone in so far,

19  I want you in writing, as short or as long, so long as

20  it's 20 pages or less -- but no one's going to have the

21  time to do 20 pages, and I promise you I'll read it.

22  And based upon my reading, and I have been clear on my

23  premise, I will either order release on these terms --

24  you've now seen what the terms are, or I will -- for

25  good and sufficient reason, deny the petition either

1    without prejudice or, um, ordering further proceedings.

2        I -- I am operating on a fairly straightforward

3    basis.  I'm trying -- so long as I can secure the safety

4    and, um, health, to the extent I can do it, of the

5    surrounding communities and the places where released

6    individuals would go, um, I -- if I can do that and we

7    can get to some acceptable level of confinement, I think

8    I will have no more to say.

9        Now, you'll understand that the petitioners will

10   want to put those they think most needy to have release

11   towards the top of the list.  I imagine that the

12   respondent's concerns will be primarily for security.

13   But to the extent you can agree, it will be helpful for

14   the Court.  Even as to Group 1, you've seen that I have

15   not taken a uniformed stance.

16       So I think I've talked enough.  The reason for

17   this hastened schedule -- um, let me say this to

18   petitioners.  This does not mean that, after 50 I'm

19   going to stop, um, if I even get to 50, and we'll

20   understand that, um, it will be much harder for the last

21   ones considered than for the earliest for the reason

22   that they'll be fewer people in the facility.

23       So -- well I will stop and I will hear the parties

24   with respect to -- in the Savino case -- oh, I didn't

25   say what happens to the remainder after 50.

1    After 50, I propose to have you folks dictate the

2    schedule.  I don't think I could go faster than 10

3    petitions a day in a prudential manner, I think that

4    adequately addresses the need, the threat of injury, and

5    at the same time provides a careful and reflective and

6    person-by-person review.

7    So after I get through Tuesday, Wednesday,

8    Thursday, Friday, and Monday, a week from now, I leave

9    it to you people to set a schedule.  It can't be any

10   faster than 10 a day, I will agree to slower, and I will

11   of course review exactly what you provide to me.

12   Matters such as -- I'm not breaking out Ms. Savino

13   here, except that there's been this motion to dismiss.

14   No one is prevented from making any motion that the

15   rules allow, as to anyone, that -- of the petitioners or

16   indeed that the respondents seek to dismiss for this or

17   that reason.  You'll understand that the speed with

18   which I address those motions may be subject to my

19   dealing with the 10 per day that I propose to rule on.

20   If I release people, it will be under the terms

21   that we've now worked out.  If I do not, I will make

22   individual orders either denying the -- denying bail and

23   therefore denying habeas corpus.  My finding as to

24   likelihood of success remains, but there are other

25   factors to be considered.

1      I've talked enough.  Mr. Sellstrom, I -- one, I'll

2   hear you both procedurally and substantively, sir.  I

3   think you know the Court's mind and I'm eager to hear

4   what you have to say.

5      MR. SELLSTROM:  Thank you, your Honor.  That -- we

6   appreciate your Honor's thoughtfulness in setting forth

7   this schedule and that is certainly something that, um,

8   we could accomplish, working with Mr. Kanwit's office,

9   and we're fully prepared to do that on the schedule your

10  Honor says for the first 50 and to see where that gets

11  us.

12      I think the only question that I would have or the

13  only request that I would have is that we, um, be able

14  to contact class members with ease, particularly over

15  the weekend, it could be an issue, but there may be

16  class members that we want to talk to directly, and

17  Mr. Kanwit's office and ours have begun to work that out

18  and I think we're on the verge of doing that.  But we

19  want to make sure that we will have that access as much

20  as possible so we can get your Honor the information in

21  the time frame that you have outlined.

22      THE COURT:  Thank you.  I don't propose to enter

23  an order, but as must be obvious, I'm not going

24  anywhere, and the Court -- nor are the officers of the

25  court.  So you'll have the availability to communicate

1   with us if necessary.  Again, and I -- and I'm not just

2   throwing around praise to throw it around, that people

3   seem to be operating in complete good faith and I'm

4   grateful for it.  Your concern is a proper one and first

5   try to work it out with Mr. Kanwit.

6        Mr. Kanwit, both the procedure and the substance,

7   sir?

8        MR. KANWIT:  Well I'm a little unsure as to

9   exactly what the Court is looking for from us in this

10  list.  It sounds like we will try to coordinate with the

11  other side to come up with a joint list of 50, but we

12  may wind up having two separate lists that overlap to

13  some extent, and is the Court expecting that we then

14  submit short -- a short statement as regards to our

15  position on the release of each of the people on the

16  list?

17       THE COURT:  A good question.  The way I thought of

18  it was the incentive to having a single list and then

19  prioritizing from that list is that you get another day

20  to prepare, because I didn't contemplate that you would

21  be giving me a short synopsis of your view, um, I just

22  wanted a list.  I have these spreadsheets.  Some of the

23  lacune on these spreadsheets are evident given your most

24  recently-submitted letter.  I also have the briefs and I

25  know what I know about these people from the records

```
 1   before me.
 2        I'm hoping you can give me one list of 50 and the
 3   Number 1 on the list is the one that you would like me
 4   to entertain -- at least get a formal submission on, the
 5   first 10, let's say, at 9:00 on Tuesday morning.  It
 6   makes it easier on you.  But I don't think I can force
 7   that because your interests may be different.
 8        So if you give me two lists or give me an
 9   overlapping list, you're not going to know until Sunday
10   at 4:00 what the Court's list is.  And as I have done
11   throughout, I've tried to do measured justice, but I am
12   struck by the exigency of time and the progress of this
13   disease.  And so this is rough.  10 a day, no oral
14   hearings, this is not what we would usually do.  But I'm
15   going to stick to that.
16        So I thought giving you an extra day would be an
17   incentive.  If you don't take it, I'll set it up through
18   next week, through Tuesday, Wednesday, Thursday, Friday,
19   and the following Monday.  I'm looking for help, but I
20   cannot compel it.  And I thought this was the best way
21   to get it.  I think that answers your question.
22        MR. KANWIT:  I think it mostly does.  If however
23   we get to the first 10 on Tuesday, whether it's by our
24   joint agreement or by receiving a list from the Court
25   Sunday afternoon, the Court is expecting some fairly
```

```
 1    succinct information regarding the factors we've

 2    identified would go to whether somebody ought to be

 3    released or detained, I assume, correct?

 4         THE COURT:  Indeed.  Indeed.  I am looking for

 5    precisely what appeared in your letter, and the fact

 6    that on certain of those I acted to continue things, but

 7    on others I -- you could argue I rejected the position

 8    you took, does not mean that for everyone I'm going to

 9    reject those concerns.  I will try, on an individual

10    basis, to act in a prudential manner.  But, yes, you've

11    got it right.

12         (Pause.)

13         THE COURT:  Any other questions?

14         MR. KANWIT:  Not on the procedure, your Honor.

15    And we've briefed the substance.  I think the Court's

16    approach to handling these people as individuals is the

17    right approach.  As we've argued and I won't go back

18    over it in depth now, I don't think class relief is

19    appropriate, I think individualized relief is

20    appropriate, and whether the Court agrees with me on

21    class certification or not, it appears that that's the

22    approach the Court is taking, and I appreciate that.

23         THE COURT:  Very well.

24         Then with that being so, are there additional

25    matters that we should deal with this afternoon?  In
```

1    Mr. McFadden and Mr. Farquhar's case, they're going to

2    submit schedules.  In the Savino case, I think I've

3    answered your questions, so I would, um, recess and

4    we'll look to see if --

5         MR. SELLSTROM:  Your Honor, before we do that, I

6    just have two very minor issues.

7         THE COURT:  Please.

8         MR. SELLSTROM:  May I?

9         THE COURT:  Yes.

10        MR. SELLSTROM:  One is, um, in the minutes from

11   the hearing the other day there was a reference to not

12   placing the spreadsheets that the parties have prepared

13   on the public docket and I just wanted to make sure that

14   that also extended to the addendum that we filed under

15   the same restrictions which had also sensitive medical

16   information.

17        THE COURT:  Yes, it does, and that's very

18   appropriate, I neglected to say it, it does, that will

19   not be on the docket.

20        MR. SELLSTROM:  Thank you.

21        And then the final is just that earlier today we

22   submitted a joint proposed protective order and

23   certainly if we're going to be working, as we hope, over

24   the weekend, if we could get the medical materials from

25   the government, that would be quite helpful.

1          THE COURT:  The protective order as -- I'm sorry.

2    The protective order as submitted will be adopted by the

3    Court and all parties, including the McMenamin, Portillo

4    parties, are bound by that protective order.

5          MR. SELLSTROM:  Thank you.

6          THE COURT:  But your comment though raises one

7    additional thing and it really is a question to the

8    respondents, Mr. Kanwit.  I made no, um, order on this

9    nor do I contemplate making an order, but I take it that

10   no one has been admitted by ICE to the facility since

11   these proceedings commenced?

12         MR. KANWIT:  I believe that to be the case, your

13   Honor.  I have not asked that question.

14         THE COURT:  Well then let me leave it like this.

15   I want you to ask it and I will order only this, because

16   I'm not trying to interfere with ICE's appropriate legal

17   prerogatives.

18         If it is contemplated that additional detainees be

19   lodged there, I want notification before that happens.

20   That's all.

21         All right?

22         MR. KANWIT:  Thank you, your Honor.

23         And, um, I believe the Court issued a blanket

24   48-hour notice for removal.  I assume, by its terms,

25   that does not apply to anybody that ICE has voluntarily

1    agreed to release, it is just removal from the Court's

2    jurisdiction?

3         THE COURT:  That is also a good question.  Right.

4    Once -- as to the ones that ICE has released, they are

5    no longer members -- they're no longer petitioners in

6    this case, and as to them the matter is moot.  They are

7    not before this court.

8         MR. KANWIT:  Thank you, your Honor.

9         And just for general notice, we do expect to

10   submit one 48-hour notice of removal for a specific

11   individual.

12        THE COURT:  Let me ask a question, and just out of

13   curiosity, we don't need to get into a specific case.

14        But do I understand it that since the airlines

15   fly, ICE, in its normal operation, continues to be able

16   to deport people who have lawful final orders of

17   removal?

18        MR. KANWIT:  I haven't explored that in detail,

19   but ICE has indicated to me, by telling me they're going

20   to remove a particular individual, that is an indication

21   to me that they do have some means of removing people.

22        THE COURT:  It will come as no surprise, I will

23   want to know how, as a practical matter, it's going to

24   be done.  But again it is no part of this Court's, um --

25   and here the jurisdiction bar is clear, but it's not

```
 1   part of this Court's jurisdiction to, um, interfere with
 2   that.  I just want to know how it's being done.
 3        All right, I'm prepared to recess unless someone
 4   has something else to say?
 5        (Silence.)
 6        THE COURT:  Hearing nothing, I do thank you.
 7   We'll stand in recess.
 8        (Ends, 3:10 p.m.)
 9
10              C E R T I F I C A T E
11
12        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,
13   do hereby certify that the foregoing record is a true
14   and accurate transcription of my stenographic notes
15   before Judge William G. Young, on April 3, 2020, to the
16   best of my skill and ability.
17
18
19
20   /s/ Richard H. Romanow 04-06-20
21   _____
     RICHARD H. ROMANOW    Date
22
23
24
25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                  )
MARIA ALEJANDRA CELIMEN SAVINO,   )
JULIO CESAR MEDEIROS NEVES,       )
and all those similarly situated, )
                                  )
            Petitioners,          )
                                  )        CIVIL ACTION
        v.                        )        NO. 20-10617-WGY
                                  )
STEVEN J. SOUZA, Superintendent of )
Bristol County House of Corrections)
in his official capacity,         )
                                  )
            Respondent.           )
                                  )
_____

YOUNG, D.J.                               April 8, 2020

**MEMORANDUM & ORDER**

**I.    INTRODUCTION**

    This habeas petition reflects the petitioners' dire
personal circumstances and legal grievances.  Yet it also speaks
to the shared anxieties of a world brought to its knees by the
pandemic of the novel coronavirus, dubbed COVID-19.  It reaches
the Court at an especially grim moment.[1]  The petitioners are
civil immigration detainees who say they are held in tight
quarters and unable to keep safe distance from others who may --

_____

    [1] See Sarah Westwood, Surgeon General: This Week Will Be
Like a 'Pearl Harbor' and '9/11' Moment, CNN (Apr. 5, 2020 1:25
pm), https://www.cnn.com/2020/04/05/politics/jerome-adams-
coronavirus/index.html.

and with time, inevitably will -- carry the highly contagious virus. They demand release or implementation of social distancing and other hygienic practices recommended by infectious disease experts.

Pending before this Court are their petition for a writ of habeas corpus, their motion for class certification, and their motion for a preliminary injunction. The Court is not yet ready to rule on the underlying habeas petition or the motion for a preliminary injunction. Rather, the Court ALLOWS the motion for class certification, with slight modification, and takes this opportunity to explain its reasoning with respect to bail. For the health and safety of the petitioners -- as well as the other inmates, staff, and the public -- the Court will expeditiously consider bail for appropriate detainees.

### A.    Factual Background

The named petitioners are two of approximately 148 individuals (the "Detainees") detained by Immigration and Customs Enforcement ("ICE") on civil immigration charges and held at the Bristol County House of Corrections ("BCHOC") in North Dartmouth, Massachusetts. Pet. Writ Habeas Corpus ("Pet.") ¶ 1, ECF No. 1; Opp'n Mot. TRO ("Opp'n"), Ex. A, Aff. Sheriff Thomas H. Hodgson ("Hodgson Aff.") ¶ 6(o), ECF No. 26-1.[2]

---

[2] Though Sheriff Hodgson's affidavit, dated March 29, 2020, states that there are 148 ICE detainees in the BCHOC, the

[2]

The Detainees are held in two on-site facilities: ninety-two are
in a separate ICE facility called the C. Carlos Carreiro
Immigration Detention Center ("Carreiro"), and the rest are
housed in a portion of the BHCOC called "Unit B" together with
non-immigration pre-trial detainees.  Id.; Pet. ¶ 1; Opp'n 2.[3]

Since February, the respondent ("the government") asserts,
the medical team and administration of BCHOC "have instituted
strict protocols to keep inmates, detainees and staff safe and
take all prudent measures to prevent exposure to the COVID- 19
infection."  Hogdson Aff. ¶ 5.  Entrance into the facilities by
outsiders is now generally prohibited; attorneys, clergy, and
staff are "medically screened prior to entrance by questions
relating to COVID-19 symptoms and by body temperature
assessment."  Id. ¶ 6(a)-(d).  Inmates and detainees who are
over 60-years-old or are immuno-compromised "are being specially
monitored."  Id. ¶ 6(k).  In addition:

> All housing units are sanitized no less than three
> times per day.  Fresh air is constantly circulated by
> opening windows and utilizing handler/vents throughout
> the day.  All feeding is done inside the housing or

government provided the Court (in a submission dated April 1,
2020) with a list of 147 names received from ICE that it
represented as a complete roster of ICE detainees at BCHOC.  The
Court expects that this discrepancy be cleared up quickly.

[3] The government explains that "[o]nly detainees who have
been classified by ICE as high risk, typically based upon
violent behavior (and not in any way related to COVID-19), are
housed with non-immigration pre-trial inmates, but this is not
in the general population."  Opp'n 2.

[3]

> cells and inmates do not congregate for meals in the
> main dining hall.  Outside recreation is done as usual
> daily except that it is now done on split schedule to
> prevent close inmate-to-inmate contact.

Id. ¶ 6(f).  According to BCHOC's medical director, Dr. Nicholas

J. Rencricca, "we are doing all that we can to reduce the risk

of a COVID-19 outbreak within BCHOC."  Aff. Nicholas J.

Rencricca, MD, PhD ¶ 24.  As of April 8, 2020, "there have been

no inmates or immigration detainees who have presented with, or

have tested positive for, COVID-19" at BCHOC, though one "unit

intake nurse tested positive for COVID-19" and she last showed

up to work on March 24.  Decl. Debra Jezard ¶ 8; Def.'s Input

Apr. 8 List 1, ECF No. 58.

　　The Detainees dispute much of this.  They allege, for

instance, that "BCHOC facilities lack adequate soap, toilet

paper, and medical resources and infrastructure to address the

spread of infectious disease or to treat people most vulnerable

to illness."  Pet. ¶ 70.  They also state that "[h]ygiene is . .

. unavailable and unavailing under the[ir] conditions," id. ¶ 6,

and that they "are unaware of any meaningful safety measures

enacted by Defendants since the inception of this crisis," id. ¶

28.  Their "confinement conditions are a tinderbox," the

Detainees warn, "that once sparked will engulf the facility."

Id. ¶ 29.  Yet there are important aspects of the Detainees'

[4]

allegations that are substantially undisputed.  Chief among
these is the challenge of social distancing in BCHOC.

The Centers for Disease Control and Prevention ("CDC")
states that "COVID-19 spreads mainly among people who are in
close contact (within about 6 feet) for a prolonged period," and
therefore recommends that everyone practice "social distancing"
-- even among those with no symptoms, since the virus can be
spread by asymptomatic people.  CDC, <u>Social Distancing,
Quarantine, and Isolation</u> (reviewed Apr. 4, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-
sick/social-distancing.html (last accessed Apr. 6, 2020).  The
CDC thus advises that everyone "[s]tay at least 6 feet (2
meters) from other people."  <u>Id.</u>  The CDC has issued guidance
specifically for prisons and detention centers that beat the
same drum.  CDC, <u>Interim Guidance on Management of Coronavirus
Disease 2019 (COVID-19) in Correctional and Detention
Facilities</u>, at 4 (Mar. 23, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-
correctional-detention.pdf ("Although social distancing is
challenging to practice in correctional and detention
environments, it is a cornerstone of reducing transmission of
respiratory diseases such as COVID-19."); <u>id.</u> ("Social
distancing is the practice of increasing the space between
individuals and decreasing the frequency of contact to reduce

[5]

the risk of spreading a disease (ideally to maintain at least 6
feet between all individuals, even those who are
asymptomatic).").

The Detainees assert that they "find it impossible to
maintain the recommended distance of 6 feet from others" and
they "must also share or touch objects used by others."  Pet. ¶
67.  They specifically allege that their beds "are situated only
3 feet apart" and that "[m]eals are inadequate and eaten in
close quarters."  Pet. ¶ 68.  Indeed, the government has
provided the Court with photos of the sleeping quarters in the
facility and this appears to be an accurate description.[4]  In one
unit the "cell size" is listed as 30 feet by 10 feet (300 square
feet), and the photo shows three bunk beds (sleeping six people)
lining the wall.  Other images supplied include a photo labeled
"Bunk Area" that shows a large room packed with rows of bunk
beds.  None appears to enjoy anything close to six feet of
isolation.  One of the named petitioners, Mr. Neves, avers that
he "is being held in the same room as 49 other people," that his
"bed is too close to other people," and that he is "not able to

_____

[4] The government protests that "not every bed is filled and
the minimal distance is believed to be between ends, not the
long sides of beds."  Def.'s Suppl. Br. 9 n.6, ECF No. 41.  The
CDC's guidelines are concerned with people, not furniture, so
the Court does not see what bearing the government's distinction
(whether the beds are measured from their length or width) has
upon the safety of the Detainees.

[ 6 ]

engage in 'social distancing.'"  TRO Mem., Ex. 8, Decl. Julio

Cesar Medeiros Neves ¶¶ 4-6, ECF No. 12-8.

    The COVID-19 global pandemic threatens all of us.  Yet

"[t]he combination of a dense and highly transient detained

population presents unique challenges for ICE efforts to

mitigate the risk of infection and transmission." Opp'n, Ex. 2,

Memorandum from Enrique M. Lucero, ICE, to Detention Wardens &

Superintendents 1 (Mar. 27, 2020), ECF No. 26-2.  As the Supreme

Judicial Court of Massachusetts recently explained in reference

to statewide correctional facilities, including BCHOC,

"correctional institutions face unique difficulties in keeping

their populations safe during this pandemic." Committee for

Pub. Counsel Servs. v. Chief Justice of the Trial Court, No.

SJC-12926, 2020 WL 1659939, at *3 (Mass. Apr. 3, 2020).  Indeed,

BCHOC's medical director acknowledged the obvious fact "that a

prison setting poses particular challenges from an infectious

disease standpoint," while asserting that "the risk of infection

is tempered by the degree of control we have over access to the

facility." Renricca Aff. ¶ 21.

    The Detainees have provided affidavits from two physicians

who have recently visited Detainees on site.  Dr. Nathan

Praschan of Massachusetts General Hospital states that "[t]he

best-known methods of preventing infectious spread," such as

"social distancing, frequent hand washing, and sanitation of

[7]

surfaces . . . are unavailable to . . . [these] detainees, who
sleep, eat, and recreate in extremely close quarters and do not
have access to basic hygienic supplies." Decl. Dr. Nathan
Praschan ¶ 9. Dr. Matthew Gartland of Brigham and Women's
Hospital avers that "based on my own experience visiting Bristol
County House of Corrections, I do not believe that . . . [these]
detainees, can be adequately protected from the virus that
causes COVID-19. This is based on a lack of private sinks or
showers and inadequate hand soap supplies, and hand sanitizers,
as well as inadequate allowance for social distancing, screening
for symptoms and exposure to the virus, testing of individuals
with symptoms, and appropriate quarantine and isolation
facilities." Decl. Dr. Matthew Gartland ¶ 16.

**B.   Procedural History**

The Detainees filed a habeas petition as a putative class
action in this Court on March 27, 2020. Pet. The petition
asserts two claims: (1) violation of due process as a result of
confinement in conditions "that include the imminent risk of
contracting COVID-19," id. ¶¶ 98-105; and (2) violation of
section 504 of the Rehabilitation Act for failure to provide
reasonable accommodations, in the form of protection against
COVID-19, to Detainees with medical conditions, id. ¶¶ 105-116.

On the same day, the Detainees filed a motion for a
temporary restraining order ("TRO"), ECF No. 11, and a motion

[8]

for class certification, ECF No. 13.  As these motions refer
only to the due process claim, the Detainees do not seek a TRO
or class certification for their claim under the Rehabilitation
Act.  See Mem. Supp. Mot. Temporary Restraining Order ("TRO
Mem."), ECF No. 12; Mem. Supp. Pls.' Mot. Class Cert. ("Class
Cert. Mem."), ECF No. 14; Reply Resp.-Def.'s Opp'n Mot. TRO
("Pet'rs' Reply") 16 n.6.  The Government has opposed both
motions.  See Opp'n; Def.'s Suppl. Br., ECF No. 41.

The Court held an initial hearing on March 30, 2020,
converting the motion for a TRO into a motion for a preliminary
injunction.[5]  ECF No. 27.  At the next hearing, on April 2, 2020,
the Court provisionally certified five subclasses and took the
other matters under advisement.  Electronic Clerk's Notes, ECF
No. 36; see Order, ECF No. 38 (listing twelve members of first
subclass).  The following day, the Court held another hearing at
which it was informed that the Government voluntarily agreed to
release six members of the first subclass.  The Court deemed the
case moot as to those individuals, ordered release on bail under
certain conditions for three other members of the subclass,[6] and

_____

[5] All hearings in this matter have been held remotely by
video conference in light of the danger posed by COVID-19.

[6] The bail order was as follows:

The Court grants bail to Henry Urbina Rivas, Robson
Maria-De Oliveira, and Jervis Vernon pending
resolution of the habeas corpus petition, upon all

[9]

Add. 42

either denied bail without prejudice or continued the matter for
the rest of the subclass.  Order, ECF No. 44.  The Court
notified the parties that it would consider bail for fifty
additional detainees, id. ¶ 6, and later set a schedule for
considering those fifty individual bail applications at a rate
of ten per day beginning on April 7, 2020.  Order, ECF No. 46.
It has since ordered bail for several more Detainees.  See ECF
Nos. 54-55.

---

bail conditions deemed appropriate and imposed by ICE,
and the following additional terms and conditions as
to each of them: (a) release only to an acceptable
custodian; (b) such custodian will pick the releasee
up outside the facility by car; (c) releasee will be
taken from the facility to the place of residence
previously identified to ICE (ICE shall notify the
state and local law enforcement authorities about
their presence and the[] details of their bail
status); (d) releasees are to be fully quarantined for
14 days from date leaving facility to the residence;
(e) during and after the 14-day quarantine, releasees
will remain under house arrest, without electronic
monitoring, and shall not . . . leave the residence
for any reason save to attend immigration proceedings
or attend to their own medical needs should those
needs be so severe that they have to go to a doctor's
office or hospital (in which case they shall notify
ICE as soon as practicable of their medical
necessity); (f) releasees are not to be arrested by
ICE officers unless: (i) upon probable cause a warrant
is issued by a United States Magistrate Judge or
United States District Judge that they have violated
any terms of their bail, or (ii) there is a final
order of removal making them presently removable from
the United States within two weeks. The Court may, sua
sponte or on motion of the parties, modify or revoke
the bail provided herein.

Order ¶ 2, ECF No. 44.

[10]

## II.   ANALYSIS

This opinion tackles three issues.  First, the Court
rejects the government's argument that the Detainees lack
Article III standing because their risk of injury is too
speculative.  Next, the Court certifies a general class of
Detainees for their due process claim of deliberate indifference
to a substantial risk of serious harm.  Though there are indeed
pertinent and meaningful distinctions among the various
Detainees, there is a common question of unconstitutional
overcrowding that binds the class together.  Nor, contrary to
the government's assertion, is there a statutory bar to class
certification in this case.  Finally, the Court explains its
rulings and authority in ordering bail for certain Detainees.

### A.   Article III Standing

To satisfy constitutional standing in federal court, a
habeas petitioner (like other litigants) "must have suffered, or
be threatened with, an actual injury traceable to the defendant
and likely to be redressed by a favorable judicial decision."
Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v.
Continental Bank Corp., 494 U.S. 472, 477 (1990)).  The
government argues the Detainees' "claims of future injury are
hypothetical" and "conjectural" because "crowding in and of
itself does not cause COVID-19 infection if none in the group
has contracted COVID-19."  Opp'n 15.

[11]

The Court disagrees.  The Supreme Court has held that
"future injuries" may support standing "if the threatened injury
is certainly impending, or there is a substantial risk that the
harm will occur."  Department of Commerce v. New York, 139 S.
Ct. 2551, 2565 (2019) (quoting Susan B. Anthony List v.
Driehaus, 134 S. Ct. 2334, 2341 (2014)).  In this moment of
worldwide peril from a highly contagious pathogen, the
government cannot credibly argue that the Detainees face no
"substantial risk" of harm (if not "certainly impending") from
being confined in close quarters in defiance of the sound
medical advice that all other segments of society now
scrupulously observe.[7]  See TRO Mem., Ex. 1, Decl. Alan S.
Keller, M.D. ¶ 10, ECF No. 12-1 ("[T]he risk of COVID-19
infection and spread in immigration detention facilities,

---

[7] Amazingly, the government appears to make this argument.
At the April 2 hearing, the government emphasized that no
Detainee or inmate in BCHOC has yet tested positive for COVID-19
and argued that "if the Court starts from the position that the
Court's goal here is to reduce the concentration of inmates it
has jumped past the presence, or non-presence, of the virus to
an assumption that the virus is present and therefore we're
going to do everything we can to increase social distancing."
In a later filing the government reiterated the point: "It is
ICE's position, for the record, that release of none of the
listed individuals is required for either their safety or the
safety of the remaining civil detainee population at BCHOC."
Defs.' Input Regarding Apr. 7 List 1, ECF No. 50.  Yet the
government's quarrel is not with the Court but with the vigorous
recommendations of infectious disease experts worldwide,
including in the federal government, to maximize social
distancing.

[12]

including Bristol County, is extremely high."). This risk of injury is traceable to the government's act of confining the Detainees in close quarters and would of course be redressable by a judicial order of release or other ameliorative relief.

Accordingly, the Court rules that the Detainees easily meet Article III's standing requirements.

**B.   Class Certification**

The Detainees moved to certify the following proposed class: "All civil immigration detainees who are now or will be held by Respondents-Defendants at the Bristol County House of Corrections (BCHOC) and the C. Carlos Carreiro Immigration Detention Center ("Carreiro") in North Dartmouth, Massachusetts."  Class Cert. Mem. 9.  At the hearing on April 2, 2020, the Court declined to certify the class as proposed but provisionally certified five subclasses.  Electronic Clerk's Notes, ECF No. 36.[8]  The Court does not now revisit that

---

[8] The Court described the five provisionally certified subclasses as follows:
Group 1: Detainees with no criminal record and no pending criminal charges.
Group 2: Detainees with medical conditions recognized under the CDC guidelines as heightening their risk of harm from COVID-19 and who have minor, non-violent criminal records or minor, non-violent criminal charges pending.
Group 3: Detainees without the medical conditions of Group 2 but who likewise have minor criminal records or minor, primarily non-violent criminal charges pending.
Group 4: Detainees with pending criminal charges against them for violent crimes, either in the United States or abroad.

[13]

provisional ruling.[9]  Yet it does, for the reasons given below,

now certify the general class as proposed by the Detainees,

albeit excluding those not yet in custody.

### 1.    Bar on Classwide Injunction in Immigration Matters

The government first argues that the proposed class cannot

be certified because 8 U.S.C. § 1252(f)(1) bars courts (other

than the Supreme Court) from enjoining or restraining the

"operation" of immigration enforcements actions except in their

application to "an individual alien against whom proceedings

under such chapter have been initiated."  Opp'n 9.  The

government cites dicta from Reno v. American Arab Anti-

Discrimination Comm. indicating that classwide injunctive relief

---

Group 5: Detainees with criminal convictions for violent crimes, either in the United States or abroad.

[9] The government argues, without citation to authority, that "Rule 23(c)(5) requires that there be a class first before subclasses are created."  Def.'s Suppl. Br. 8.  The Court has found only one judicial opinion seemingly endorsing that view, Sprague v. General Motors Corp., 133 F.3d 388, 399 n.9 (6th Cir. 1998) (en banc), while the Eleventh Circuit disagrees, Klay v. Humana, Inc., 382 F.3d 1241, 1261-62 (11th Cir. 2004).  See 3 William B. Rubenstein, Newberg on Class Actions § 7:29 n.1 (5th ed. 2019) (citing circuit split); Scott Dodson, Subclassing, 27 Cardozo L. Rev. 2351, 2389 (2006) (concluding that "the best interpretation" of Fed. R. Civ. P. 23 allows subclasses to be certified in the absence of a valid general class).  The First Circuit recently suggested that "[t]he commonality standard might also be satisfied in some cases by certifying subclasses." Parent/Professional Advocacy League v. City of Springfield, 934 F.3d 13, 29 n.15 (1st Cir. 2019) (citing Mark C. Weber, IDEA Class Actions After Wal-Mart v. Dukes, 45 U. Tol. L. Rev. 471, 498-500 (2014)).  In any case, because the Court now certifies the general class, the question is academic.

[14]

is simply not available in immigration cases.  525 U.S. 471,
481-82 (1999) (describing § 1252(f) as "prohibit[ing] federal
courts from granting classwide injunctive relief against the
operation of [8 U.S.C.] §§ 1221-1231").  Thus, the government
appears to argue, the Court cannot certify this class now
because it will not later be able to provide classwide relief.

     Yet section 1252(f) says nothing about declaratory relief,
which the Detainees expressly request here in addition to
injunctive relief.  Pet. 24.  Accordingly, this provision does
not bar declaratory relief and therefore poses no obstacle to
class certification.  See Reid v. Donelan, 390 F. Supp. 3d 201,
226 (D. Mass. 2019) (Saris, C.J.); Rodriguez v. Marin, 909 F.3d
252, 256 (9th Cir. 2018); Alli v. Decker, 650 F.3d 1007, 1014
(3d Cir. 2011).  Seeking to avoid this conclusion, the
government cites a Sixth Circuit decision for the proposition
that declaratory relief may be the "functional equivalent" of a
prohibited classwide injunction.  Opp'n 11 (quoting Hamama v.
Adducci, 912 F.3d 869, 880 n.8 (6th Cir. 2018)).  The Sixth
Circuit opinion was issued after three Justices argued to the
contrary in Jennings v. Rodriguez, 138 S. Ct. 830, 876 (2018)
(Breyer, J., dissenting), but before three other Justices
agreed, see Nielsen v. Preap, 139 S. Ct. 954, 962 (2019)
(plurality opinion).  With six Justices of the current Supreme
Court now on record stating that section 1252(f) does not bar

[15]

declaratory relief, and because that is the better reading of
the statute, the Court adheres to that view.  See Reid, 390 F.
Supp. 3d at 226; Reid v. Donelan, No. 13-30125-PBS, 2018 WL
5269992, at *7-8 (D. Mass. Oct. 23, 2018) (Saris, C.J.).

This is not to suggest that injunctive relief will be
categorically unavailable in this case.  See Marin, 909 F.3d at
256 (allowing a classwide injunction when all members of the
class were individuals against whom detention proceedings had
been initiated, in accordance with the exception contained in
section 1252(f)(1)).  Nor does the Court intimate that it will
eventually provide any relief at all, since it has not yet
reached the merits.  At this class certification stage, it is
enough to establish that the Court could provide a classwide
remedy in the form of a declaratory judgment or injunctive
relief.  Having established that, the Court rejects the
government's argument that section 1252(f) precludes class
certification.

   **2.   The Requirements of Rule 23**

"To obtain class certification, the plaintiff must
establish the four elements of [Fed. R. Civ. P.] 23(a) and one
of several elements of Rule 23(b)."  Smilow v. Southwestern Bell
Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003) (citing
Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997)). Rule
23(a) permits class certification only if:

[16]

        (1) the class is so numerous that joinder of all
        members is impracticable; (2) there are questions of
        law or fact common to the class; (3) the claims or
        defenses of the representative parties are typical of
        the claims or defenses of the class; and (4) the
        representative parties will fairly and adequately
        protect the interests of the class.

Fed. R. Civ. P. 23(a).

    In addition to establishing these four elements, the

Detainees must satisfy one of Rule 23(b)'s categories.  The

Detainees rely on Rule 23(b)(2), Class Cert. Mem. 16-17, which

permits class certification when "the party opposing the class

has acted or refused to act on grounds that apply generally to

the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a

whole."  Fed. R. Civ. P. 23(b)(2).

    Since numerosity and adequacy appear well-founded, the

government challenges only the commonality and typicality of the

proposed class.  Opp'n 13 ("The proposed class lacks uniformity

and the Plaintiffs are not representative of the proposed class

members.").  Though commonality and typicality are distinct

elements under Rule 23(a), the Supreme Court has repeatedly

recognized that they "tend to merge."  Wal-Mart Stores, Inc. v.

Dukes, 564 U.S. 338, 349 n.5 (2011) (quoting General Tel. Co. of

Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)).  Indeed, the

government attacks both commonality and typicality with the same

set of arguments.  The gist of the government's contention on

                              [17]

this score is that the various detainees are not "similarly situated" because they "are of different ages and all present different levels of health at this time."  Opp'n 12. Furthermore, the government points out that some detainees are subject to statutorily mandated detention while others are not, and that "each detainee presents a different risk of flight and/or public safety threat if released."  Id.  Accordingly, the Court treats commonality and typicality together.

To establish commonality under Rule 23(a)(2), one common question is enough.  Wal-Mart, 564 U.S. at 359.  "A question is common if it is 'capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  Parent/Professional Advocacy League v. City of Springfield, 934 F.3d 13, 28 (1st Cir. 2019) (quoting Wal-Mart, 564 U.S. at 350).  It is not critical whether common "questions" are raised; the decisive factor is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."  Id. (quoting Wal-Mart, 564 U.S. at 350).

The Detainees frame the common question as follows: "Whether the conditions of confinement at Bristol County Immigration Detention Facilities, under the current conditions and in light of the COVID-19 pandemic, render class members'

[18]

confinement a punishment that violates constitutional

standards." Class Cert. Mem. 18-19. Here, as is typical in the

Rule 23 commonality inquiry, "proof of commonality necessarily

overlaps with [the Detainees'] merits contention." Wal-Mart,

564 U.S. at 352. Accordingly, the Court now discusses the

merits of the Detainees' constitutional claim, but only to the

extent necessary to decide the class certification question.

See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S.

455, 466 (2013) ("Merits questions may be considered to the

extent -- but only to the extent -- that they are relevant to

determining whether the Rule 23 prerequisites for class

certification are satisfied.").

When the government "so restrains an individual's liberty

that it renders him unable to care for himself, and at the same

time fails to provide for his basic human needs -- e.g., food,

clothing, shelter, medical care, and reasonable safety -- it

transgresses . . . the Due Process Clause." DeShaney v.

Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989).

The due process guarantee of the Constitution obliges the

government "to refrain at least from treating a pretrial

detainee with deliberate indifference to a substantial risk of

serious harm to health." Coscia v. Town of Pembroke, 659 F.3d

37, 39 (1st Cir. 2011) (citing City of Revere v. Massachusetts

Gen. Hosp., 463 U.S. 239, 244 (1983) & Farmer v. Brennan, 511

[19]

U.S. 825, 835 (1994)).  "Proof of deliberate indifference
requires a showing of greater culpability than negligence but
less than a purpose to do harm," id. (citing Farmer, 511 U.S. at
835), "and it may consist of showing a conscious failure to
provide medical services where they would be reasonably
appropriate," id. (citing Estelle v. Gamble, 429 U.S. 97, 104
(1976)).  "To show such a state of mind, the plaintiff must
provide evidence that the defendant had actual knowledge of
impending harm, easily preventable, and yet failed to take the
steps that would have easily prevented that harm."  Leite v.
Bergeron, 911 F.3d 47, 52-53 (1st Cir. 2018) (quoting Zingg v.
Groblewski, 907 F.3d 630, 635 (1st Cir. 2018) (further citation
and internal quotation marks omitted).  "This standard,
requiring an actual, subjective appreciation of risk, has been
likened to the standard for determining criminal recklessness."
Id. at 53 (quoting Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st
Cir. 1999)).  Courts generally apply the same standard for civil
immigration detainees as for pre-trial detainees.  See E. D. v.
Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019) (stating that "the
legal rights of an immigration detainee [are] analogous to those
of a pretrial detainee" and collecting cases of other circuits).

    With this legal background in mind, it is understandable
why the government highlights the differences among the
Detainees.  For example, it may be easier for Detainees who are

[20]

at heightened risk of harm from COVID-19 to prove the
"substantial risk of serious harm" prong of the inquiry than it
will be for healthier Detainees who lack special risk factors.
Detainees with a serious criminal background might have a
tougher time demonstrating that the government could "have
easily prevented that harm" by releasing them on bond, for
instance.  Indeed, these very considerations guided the Court in
provisionally certifying five separate subclasses.

Upon reflection, however, the Court determines that the
admittedly significant variation among the Detainees does not
defeat commonality or typicality.  At bottom, a common question
of law and fact in this case is whether the government must
modify the conditions of confinement -- or, failing that,
release a critical mass of Detainees -- such that social
distancing will be possible and all those held in the facility
will not face a constitutionally violative "substantial risk of
serious harm."  Farmer, 511 U.S. at 847.  Crucial to the Court's
determination is the troubling fact that even perfectly healthy
detainees are seriously threatened by COVID-19.  To be sure, the
harm of a COVID-19 infection will generally be more serious for
some petitioners than for others.  Yet it cannot be denied that
the virus is gravely dangerous to all of us.

Consider recent data from the CDC.  In a sample of COVID-19
patients aged 19 and older with no underlying health conditions

[21]

or risk factors, approximately 7.2-7.8% were hospitalized

without requiring admission to the Intensive Care Unit ("ICU"),

and an additional 2.2-2.4% were hospitalized in the ICU,

totaling 9.6-10.4%.  If the pool is restricted to patients

between the ages of 19 and 64, all with no underlying health

conditions reported, approximately 6.2-6.7% were hospitalized

without admission to the ICU, and an additional 1.8-2.0%

required the ICU, for a total hospitalization rate of 8-8.7%.

The rates of hospitalization and ICU admittance are

significantly higher for those with underlying health

conditions.[10]  Since COVID-19 is highly contagious and the

quarters are close, the Detainees' chances of infection are

great.  Once infected, taking hospitalization as a marker of

"serious harm," it is apparent that even the young and otherwise

healthy detainees face a "substantial risk" (between five and

ten percent) of such harm.

Likewise, the "deliberate indifference" part of the

inquiry, which asks whether the government "disregards th[e]

---

[10] See Nancy Chow et al., CDC COVID-19 Response Team, Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020, 69 Morbidity & Mortality Weekly Report 382, 382-84 (Apr. 3, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.  It must be emphasized that this data is partial and preliminary. See id. at 384-85 (listing six limitations on the report's findings).

[22]

risk by failing to take reasonable measures to abate it,"
Farmer, 511 U.S. at 847, is apt to generate a common answer for
the entire class of Detainees.  The question is not so much
whether any particular Detainee should be released -- a matter
as to which the various individuals are surely differently
situated.  Rather, the question is whether the government is
taking reasonable steps to identify those Detainees who may be
released in order to protect everyone from the impending threat
of mass contagion.  Nor does it matter how the density of
Detainees is reduced.  Transfer to less crowded facility,
deportation, release on bond, or simply declining to contest
lawful residence -- any of these methods would effectively
minimize the concentration of people in the facility.  This
affords the government greater flexibility and minimizes the
differences among the various Detainees.

    The case law supports a finding of commonality for class
claims against dangerous detention conditions, even when some
detainees are more at risk than others.  For example, the Ninth
Circuit affirmed class certification for an Eighth Amendment
challenge to inmate medical care policies, explaining that
"although a presently existing risk may ultimately result in
different future harm for different inmates -- ranging from no
harm at all to death -- every inmate suffers exactly the same
constitutional injury when he is exposed to a single statewide

[ 23 ]

[department of corrections] policy or practice that creates a
substantial risk of serious harm." <u>Parsons</u> v. <u>Ryan</u>, 754 F.3d
657, 678 (9th Cir. 2014).  Similarly, the Fifth Circuit affirmed
class certification of <u>all</u> prisoners in an overheated prison,
despite the variations in health and risk among prisoners,
because the prison authority's "heat-mitigation measures . . .
were ineffective to reduce the risk of serious harm to a
constitutionally permissible level for any inmate, including the
healthy inmates." <u>Yates</u> v. <u>Collier</u>, 868 F.3d 354, 363 (5th Cir.
2017).  Here, too, even the otherwise healthy Detainees face a
substantial risk of serious harm from COVID-19.  The commonality
analysis of <u>Parsons</u> and <u>Yates</u> is persuasive and has been
approvingly cited by the First Circuit.  <u>See</u>
<u>Parent/Professional</u>, 934 F.3d at 28 n.14.  Accordingly, the
Court rules that the commonality and typicality prongs of the
Rule 23(a) analysis are satisfied.

Before certifying the class, the Court pauses to consider
the uniformity of remedy required by Rule 23(b)(2).  <u>See</u> <u>Wal-</u>
<u>Mart</u>, 564 U.S. at 360 (holding that "Rule 23(b)(2) applies only
when a single injunction or declaratory judgment would provide
relief to each member of the class.  It does not authorize class
certification when each individual class member would be
entitled to a different injunction or declaratory judgment
against the defendant.").  Thus, the Court may certify the class

[24]

only if it would be entitled to an "indivisible" remedy.  Id.
The Court concludes that a uniform remedy would be possible in
this case, whether in the form of declaratory relief or
(depending on the proper reading of 8 U.S.C. § 1252(f), as
alluded to above) an injunction ordering the government to
reduce crowding of Detainees.  Cf. Brown v. Plata, 563 U.S. 493,
502 (2011) (affirming classwide injunction of "court-mandated
population limit" in state prisons to remedy Eighth Amendment
violations due to "severe and pervasive overcrowding").

    Thus, the requirements of Rule 23 are met and the Court
certifies the general class as proposed by the Detainees, with
one caveat: The Court declines to include those who "will be
held," Class Cert. Mem. 9, but are not yet in custody.  Although
the government has not declared that it will not admit more
detainees to BCHOC during this health crisis, it has agreed to
notify the Court before doing so.  Tr. Hr'g 25, ECF No. 48.  The
Court sees no need to include possible future detainees in this
class.  Moreover, since the situation is rapidly evolving and
future detainees may well be subject to different confinement
conditions than those now obtaining, it may be that the named
representative cannot "fairly and adequately protect the
interests" of those future detainees.  Fed. R. Civ. P. 23(a)(4);
cf. Amchem, 521 U.S. at 625-26 (holding that differences between

[25]

currently injured and not-yet-injured members of proposed class
defeated adequacy requirement).

### C.    The Court's Inherent Authority to Order Bail

The Court now turns to explain its decision to order bail
for several Detainees and to consider bail applications for
others.  The First Circuit has explained "that a district court
entertaining a petition for habeas corpus has inherent power to
release the petitioner pending determination of the merits."
Woodcock v. Donnelly, 470 F.2d 93, 94 (1st Cir. 1972) (per
curiam).  Such authority may be exercised in the case of "a
health emergency," where the petitioner has also demonstrated a
likelihood of success on the merits.  Id.  For example, Woodcock
approvingly cited Johnston v. Marsh, in which the Third Circuit
affirmed the decision of the district court granting bail to a
habeas petitioner who, "as an advanced diabetic, was, under
conditions of confinement, rapidly progressing toward total
blindness."  227 F.2d 528, 529-32 (3d Cir. 1955).  In Mapp v.
Reno, the Second Circuit held that "the federal courts have the
same inherent authority to admit habeas petitioners to bail in
the immigration context as they do in criminal habeas case."
241 F.3d 221, 223 (2d Cir. 2001).  A court considering bail for
a habeas petitioner "must inquire into whether 'the habeas
petition raise[s] substantial claims and [whether] extraordinary
circumstances exist[] that make the grant of bail necessary to

[26]

make the habeas remedy effective.'"  <u>Id.</u> at 230 (alterations in
original) (quoting <u>Iuteri</u> v. <u>Nardoza</u>, 662 F.2d 159, 161 (2d Cir.
1981)).

Other courts, including another session of this Court, have
recently relied on <u>Mapp</u> to order bail for habeas petitioners who
were civil immigration detainees at risk due to the COVID-19
pandemic.  <u>See</u> <u>Avendaño Hernandez</u> v. <u>Decker</u>, No. 20-CV-1589
(JPO), 2020 WL 1547459, at *2-4 (S.D.N.Y. Apr. 1, 2020); <u>Jimenez</u>
v. <u>Wolf</u>, Civ. A. No. 18-10225-MLW, Memorandum & Order ("<u>Jimenez</u>
Order"), ECF No. 507 (D. Mass. Mar. 26, 2020) (Wolf, J.).  As
expressed during the hearing on April 3, the Court follows these
precedents in construing its authority to order bail for habeas
petitioners under the reigning "exceptional circumstances,"
<u>Glynn</u> v. <u>Donnelly</u>, 470 F.2d 95, 98 (1972), of this nightmarish
pandemic.  Like Judge Wolf in <u>Jiminez</u> and Judge Oetken in
<u>Hernandez</u>, this Court ruled that bail was appropriate for some
Detainees on the basis of <u>Mapp</u> and its First Circuit analogues.[11]

---

[11] The First Circuit in <u>Glynn</u> stated that bail should not be
ordered without "a clear case" on both the law and the facts,
and that "Merely to find that there is a substantial question is
far from enough," 470 F.2d at 98, and <u>Woodcock</u> indicated that a
finding of likelihood of success on the merits may be needed,
470 F.2d at 94.  This contrasts with <u>Mapp</u>, which required only
(apart from the presence of extraordinary circumstances) that
the petitioner raise "substantial claims."  241 F.3d at 230.
Yet, as Judge Wolf observed, the First Circuit cases were
dealing with a state prisoner convicted of a crime and for that
reason insisted upon a higher standard, <u>see</u> <u>Glynn</u>, 470 F.2d at
98, whereas here "the <u>Mapp</u> test or something similar or perhaps

Additionally, the Court follows the light of reason and the
expert advice of the CDC in aiming to reduce the population in
the detention facilities so that all those who remain (including
staff) may be better protected.  In this respect, the Supreme
Judicial Court of Massachusetts has articulated sound
principles: "[T]he situation is urgent and unprecedented, and .
. . a reduction in the number of people who are held in custody
is necessary," but "the process of reduction requires
individualized determinations, on an expedited basis, and, in
order to achieve the fastest possible reduction, should focus
first on those who are detained pretrial who have not been
charged with committing violent crimes."  <u>Committee for Pub.
Counsel Servs.</u>, 2020 WL 1659939, at *9.[12]  The Court will proceed
in a similar fashion in diligently entertaining bail
applications while the petitions for habeas corpus are pending.

_____

less is appropriate."  <u>Jimenez</u> Order, Ex. 1, at 1-2, ECF No.
507-1.  This Court agrees, though it makes little difference
because the Detainees released on bail would also satisfy a more
exacting standard.

[12] With respect to federal prisons, Congress responded to
the pandemic by expressly authorizing the Bureau of Prisons to
exceed the statutory maximum period of home confinement if the
Attorney General makes a finding of "emergency conditions,"
CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020), and the
Attorney General has now found such an emergency.  <u>See</u>
Memorandum of Attorney General William Barr to Director of
Bureau of Prisons (Apr. 3, 2020),
https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-
c6d51b810000.

[28]

**III. CONCLUSION**

The motion for class certification is <u>ALLOWED</u>.  The Court now certifies the following class: "All civil immigration detainees who are now held by Respondents-Defendants at the Bristol County House of Corrections and the C. Carlos Carreiro Immigration Detention Center in North Dartmouth, Massachusetts." The named petitioners in this action, Maria Alejandra Celimen Savino and Julio Cesar Medeiros Neves, are appointed class representatives.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE

Add. 62

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                    )
MARIA ALEJANDRA CELIMEN SAVINO,     )
JULIO CESAR MEDEIROS NEVES,         )
and all those similarly situated,   )
                                    )
        Plaintiffs-Petitioners,     )
                                    )        CIVIL ACTION
        v.                          )        NO. 20-10617-WGY
                                    )
STEVEN J. SOUZA, Superintendent of  )
Bristol County House of Correction  )
in his official capacity,           )
                                    )
        Defendant-Respondent.       )
                                    )
———————————————————————

YOUNG, D.J.                                    May 12, 2020

**MEMORANDUM OF DECISION**

## I.    INTRODUCTION

        The Constitution dictates that the government reasonably

safeguard those in its custody, for the power to incarcerate

implies the duty to protect.  How far does that duty go amidst

the global pandemic of the COVID-19 virus?  That is the enigma

this Court, like others across the nation, has grappled with in

this case.  A class of civil immigration detainees held in the

Bristol County House of Correction, citing this unparalleled

health crisis, press this Court to release them from confinement

in tight and allegedly unsanitary quarters.  The government

refuses to play ball.

The Court has matched the unusual health emergency with an unusual procedural maneuver.  Before addressing the merits of the petition, the Court relied on its inherent authority expeditiously to review bail applications for all of the detainees in the class, one by one, and released almost a third of them to house arrest under strict conditions.  These releases have meaningfully reduced the crowding at the detention center and, one hopes, hindered the virus' spread.  The Court then turned to the pending motion for a preliminary injunction and, after briefing and oral argument, preliminarily ordered the government (1) to test all detainees and staff who come into contact with them; and (2) not to admit any more detainees to this facility.[1]  This memorandum lays out the Court's reasoning.

As explained more fully below, the Court reaches three essential conclusions.  First, withholding this preliminary injunction would likely cause the detainees irreparable harm because some number of them would get seriously ill or die.  Second, the government's response likely amounts to deliberate indifference to a substantial risk of serious harm to the detainees' health.  This deliberate indifference is proven by the government's near-blanket opposition to the release of

_____

[1] The preliminary injunction was issued orally at the hearing held by video conference on May 7, 2020.  ECF No. 168. The full order is recorded at the end of this memorandum.  The Court modified the order on May 11, 2020.  ECF No. 172.

[ 2 ]

detainees throughout the bail process (though it did somewhat reduce the population through limited bond releases and deportations), as well as by its minimal efforts at testing and contact tracing.

Third, the balance of the equities and the public interest weigh in favor of the injunction.  In so finding, the Court notes that this injunction does not prohibit the government's (and the public's) two primary interests in enforcing the immigration laws -- deporting those unlawfully present and confining those who are dangerous or flight risks.  Yet, to the extent it reduces the risk of an uncontainable outbreak in the facility, the injunction secures the safety of the detainees, the guards and other staff, their families, and ultimately the public at large.  The scale thus tips lopsidedly toward the interim equitable relief ordered by the Court.

## II.    PROCEDURAL BACKGROUND

The named plaintiffs-petitioners are two of 148 individuals (the "Detainees") detained by Immigration and Customs Enforcement ("ICE") on civil immigration charges who, at the start of this litigation, were held at the Bristol County House of Correction ("BCHOC") in North Dartmouth, Massachusetts.  Pet. Writ Habeas Corpus ("Pet.") ¶ 1, ECF No. 1; Opp'n Mot. Temporary Restraining Order ("Opp'n TRO"), Ex. A, Aff. Sheriff Thomas H. Hodgson ("Hodgson Aff.") ¶ 6(o), ECF No. 26-1.  On March 27,

[3]

2020, the Detainees filed a purported class action suit alleging, as relevant here, that the conditions of their confinement violated their due process rights and seeking release. <u>See generally</u> Pet. The gravamen of the complaint was that the facility was simply too crowded to practice social distancing in accordance with ubiquitous medical advice, <u>id.</u> ¶¶ 67-68, and that the conditions were otherwise unhygienic, <u>id.</u> ¶ 70. The Detainees also filed a motion for class certification, ECF No. 13, and a motion for a temporary restraining order, ECF No. 14, which the Court converted into a motion for a preliminary injunction at the initial hearing held on March 30, 2020.[2]

At a hearing on April 2, 2020, the Court provisionally certified five subclasses, ECF No. 36, and later that day put together a list (using information from a spreadsheet helpfully provided by the respondent, or "the government") of twelve Detainees with no criminal history or pending criminal charges, ECF No. 38. The next morning, counsel for the government informed the Court that ICE would voluntarily release six of those individuals on Orders of Supervision. At a hearing that same day, the government told the Court that ICE would not voluntarily release anyone else. Tr. Hr'g (Apr. 3, 2020) 6:4-8,

---

[2] All hearings in this matter have been held remotely by video conference in light of the danger posed by COVID-19.

[4]

ECF No. 48.  The Court ordered bail for three Detainees at that
hearing and requested that the parties supply (jointly or
separately) a list of fifty names to consider for bail.  Id. at
8, 15-17.  Neither party opted to select fifty candidates.  On
April 8, 2020, the Court certified the general class of
presently incarcerated Detainees and explained the basis for its
bail procedures.  Savino v. Souza (Savino I), __ F. Supp. 3d __,
No. 20-10617-WGY, 2020 WL 1703844 (D. Mass. Apr. 8, 2020).

Over the next several weeks, the Court received briefing
from the parties relating to each Detainee's criminal and
medical histories, as well as other pertinent information, and
assessed each one individually.  True to its word, ICE
systematically opposed bail for every Detainee after the initial
six.  For each group the Court considered, the government
stated: "It is ICE's position, for the record, that release of
none of the listed individuals is required for either their
safety or the safety of the remaining civil detainee population
at BCHOC."  ECF Nos. 50, 58, 67, 75, 79, 80, 85, 88, 94, 102,
105, 111, 116.[3]  The Court ruled on the bail applications that
were relatively clear cases -- whether granting or denying --

---

[3] The only cracks in this wall of refusal were two Detainees
whom the government offered as substitutes in place of
individuals the Court had previously ordered released on bail.
See ECF Nos. 51, 63.

and took the rest under advisement.[4]  Between the filing of the

case and the preliminary injunction, six Detainees were released

by ICE on Orders of Supervision, forty-four were granted bail by

this Court, fifteen were released on bond through the

immigration courts, fifteen were (or were soon scheduled to be)

deported, and five new individuals were added by ICE.  Of the

148 Detainees held at BCHOC at the start of the litigation,

there remained 80 after the Court's last bail order on May 5,

2020.  ECF No. 147; Opp'n Mot. Prelim. Inj. ("Opp'n") 5, ECF No.

---

[4] Detention for immigrants awaiting deportation is roughly
equivalent to denying bail to a person accused of crime.  In
both cases the goals are the same: to minimize danger to the
community and curtail the risk of flight.  As an experienced
trial judge at both the state and federal levels, I have been
struck by the fact that the great bulk of these 148 detainees --
not all but most -- would have been admitted to bail on terms
were they American citizens facing criminal charges.  The fact I
did not release more is due solely to the proper respect I owe
to the administrative hearing officers within the executive.

   If this small cohort is at all reflective of the nearly
thirty thousand detainees in ICE custody across the nation, it
would appear we are spending millions of our national treasure
to lock up thousands of people who might better be released on
strict bail conditions without impairing the safety of our
citizens or the operations of our government.  See Detention
Statistics, https://www.ice.gov/detention-management (last
accessed May 11, 2020) (listing 28,865 immigration detainees in
custody as of May 2, 2020); see also ICE, U.S. Immigration and
Customs Enforcement Fiscal Year 2019 Enforcement and Removal
Operations Report 5, 8,
https://www.ice.gov/sites/default/files/documents/Document/2019/
eroReportFY2019.pdf (stating that 50,165 individuals, on
average, were daily in ICE custody in fiscal year 2019, with an
average length of stay of 34.3 days).

164; id., Ex. A, Third Decl. Steven Souza ("Third Souza Decl.")
¶ 9, ECF NO. 164-1.

　　The Court received briefing on the motion for a preliminary
injunction.  Pls.' Suppl. Mem. Supp. Mot. Prelim. Inj. ("Pls.'
Suppl. Mem."), ECF No. 150; Opp'n.  After a hearing held on May
7, 2020, the Court orally issued the preliminary injunction and
explained its reasoning.  ECF No. 168.  This memorandum of
decision further explicates the basis for the preliminary
injunction.  See Fed. R. Civ. P. 52(a).

## III. THRESHOLD ISSUES

　　Before embarking on the preliminary injunction discussion,
the Court briefly detours to address several threshold hurdles
raised by the government.  First, the government argues that the
Detainees lack constitutional standing for this preliminary
injunction.  Opp'n 27-28.  The Court disagrees for the reasons
articulated in its prior opinion certifying the class.  Savino
I, 2020 WL 1703844, at *4; see also Helling v. McKinney, 509
U.S. 25, 33 (1993) ("It would be odd to deny an injunction to
inmates who plainly proved an unsafe, life-threatening condition
in their prison on the ground that nothing yet had happened to
them.").

　　Second, the government argues that the Detainees cannot
challenge the conditions of confinement in a habeas action,
which is limited to challenges to the fact or duration of

[7]

confinement.  Opp'n 19-20 (quoting <u>Jenkins</u> v. <u>Spaulding</u>, No. 19-
10078-MPK, 2019 WL 1228093 (D. Mass. Feb. 22, 2019) (Kelley,
M.J.); <u>Kane</u> v. <u>Winn</u>, 319 F. Supp. 2d 162, 213-15 (D. Mass.
2004)).  Even were habeas actions so limited,[5] the Detainees have
styled their action as <u>both</u> a habeas petition under 28 U.S.C. §
2241 <u>and</u> a complaint seeking declaratory and injunctive relief.
Pet. 1.  That being so, a cause of action for equitable relief
relating to their conditions of confinement is available wholly
apart from habeas.  <u>See</u> <u>Simmat</u> v. <u>U.S. Bureau of Prisons</u>, 413
F.3d 1225, 1231-33 (10th Cir. 2005).  Moreover, this preliminary
injunction is not itself habeas relief, but rather "interim
equitable relief [whose purpose] is not to conclusively
determine the rights of the parties, but to balance the equities
as the litigation moves forward."  <u>Trump</u> v. <u>International
Refugee Assistance Project</u> (<u>IRAP</u>), 137 S. Ct. 2080, 2087 (2017)
(citing <u>University of Tex.</u> v. <u>Camenisch</u>, 451 U.S. 390, 395
(1981)).  Thus, the Court does not see why this preliminary

---

[5] The Court need not decide whether this is indeed the law
in the First Circuit, and if so whether that rule applies to
detainees in federal custody.  <u>Compare</u> <u>Gonzalez-Fuentes</u> v.
<u>Molina</u>, 607 F.3d 864, 873-74 (1st Cir. 2010) (prisoners'
challenge to conditions of state confinement must be brought
under 42 U.S.C. § 1983, not habeas), <u>with</u> <u>United States</u> v.
<u>DeLeon</u>, 444 F.3d 41, 59 (1st Cir. 2006) ("If the conditions of
incarceration raise Eighth Amendment concerns, habeas corpus is
available."), <u>and</u> <u>Brennan</u> v. <u>Cunningham</u>, 813 F.2d 1, 4 (1st Cir.
1987); <u>cf.</u> <u>Aamer</u> v. <u>Obama</u>, 742 F.3d 1023, 1035-38 (D.C. Cir.
2014).

injunction must stick within habeas' fact-of-confinement domain.[6]
"Once invoked, the scope of a district court's equitable powers
. . . is broad, for breadth and flexibility are inherent in
equitable remedies." Brown v. Plata, 563 U.S. 493, 538 (2011)
(omission in original) (internal quotation marks and citations
deleted).

Finally, the government contends that 8 U.S.C. § 1252(f)
bars the Court from issuing any classwide injunctive relief.
Opp'n 25-27.  The Supreme Court has observed that section
1252(f) "prohibits federal courts from granting classwide
injunctive relief against the operation of §§ 1221-1231, but
specifies that this ban does not extend to individual cases."
Reno v. American-Arab Anti-Discrimination Committee, 525 U.S.
471, 481-82 (1999).  That provision, however, does not apply
here for two reasons.

First, section 1252(f)(1) does not apply to "individual
alien[s] against whom [immigration] proceedings . . . have been
initiated" -- a category that embraces all class members here.

---

[6] The Supreme Court has stated that "[i]f a request for a
permanent injunction does not sound in habeas, it follows that
the lesser included request for a temporary stay (or preliminary
injunction) does not either." Nelson v. Campbell, 541 U.S. 637,
647 (2004).  Yet the Court is unaware of a case stating that
when a permanent injunction does sound in habeas (as here, given
that the petitioners seek release), the Court's equitable powers
in fashioning an appropriate preliminary injunction are
constrained.

[9]

See Rodriguez v. Marin, 909 F.3d 252, 256 (9th Cir. 2018).

Second, section 1252(f)(1) denies this Court the "jurisdiction or authority to enjoin or restrain the operation" of certain immigration statutes.  8 U.S.C. § 1252(f)(1).  Yet the Court's preliminary injunction simply requires COVID-19 testing and halts admissions of new detainees to a particular facility, matters as to which the immigration statutes are silent.  The statute does say that "[t]he Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), but the First Circuit has explained that "section 1231(g) fails to 'specify' that individualized transfer decisions are in the Attorney General's discretion."  Aguilar v. U.S. ICE, 510 F.3d 1, 20 (1st Cir. 2007).  To the extent section 1231(g)(1) grants transfer authority, merely taking one facility off the list of possible detention centers while litigation ensues does not "enjoin or restrain the operation" of the statute absent some showing that the Attorney General cannot arrange for a detainee to be housed in another appropriate place.

Having cleared these threshold obstacles, the Court moves on to discuss the grounds for its preliminary injunction.

[10]

## IV.   THE PRELIMINARY INJUNCTION

### A.   Legal Standard

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." IRAP, 137 S. Ct. at 2087.  The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Benisek v. Lamone, 138 S. Ct. 1942, 1945 (2018) (quoting Camenisch, 451 U.S. at 395 (1981).  It "serves as an equitable policing measure to prevent the parties from harming one another during the litigation; to keep the parties . . . as far as possible in the respective positions they occupied when the suit began." Francisco Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 15 (1st Cir. 2009) (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953) (Frank, J.)).

"To secure a preliminary injunction, a plaintiff must show: '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020) (quoting Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)).  "[T]he first two factors, likelihood of

[11]

success and of irreparable harm, [are] 'the most important' in
the calculus." Bruns v. Mayhew, 750 F.3d 61, 65 (1st Cir. 2014)
(quoting González-Droz v. González-Colón, 573 F.3d 75, 79 (1st
Cir. 2009)). "[T]he measure of irreparable harm is not a rigid
one; it has been referred to as a sliding scale, working in
conjunction with a moving party's likelihood of success on the
merits," such that a greater likelihood of success on the merits
permits "somewhat less" of a showing of irreparable harm.
Vaquería Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st
Cir. 2009) (quoting EEOC v. Astra USA, Inc., 94 F.3d 738, 743
(1st Cir. 1996)).

**B.   Likelihood of Irreparable Harm**

The Court presumes that, in ordering the release on bail of
a portion of the Detainees, it has substantially reduced the
risk of infection for those who remain.  Yet the threat
persists.  As of May 7, when the preliminary injunction was
issued, the record indicates that eleven BCHOC staff members,
one ICE detainee, and one state inmate had tested positive for
COVID-19.  See Pls.' Suppl. Mem. 8 & n.6.[7]  Twenty-four ICE

---

[7] See also Bristol County Sheriff's Office
(@BristolSheriff), Twitter (May 5, 2020, 4:22 PM),
https://twitter.com/BristolSheriff/status/1257767668561489921
(last accessed May 8, 2020) (press release stating that a state
inmate tested positive for COVID-19, seven staff members who
tested positive were away recovering, and four staff members who
tested positive had returned to work).

detainees had tested negative (six refused to be tested), and
the rest had never been tested.  Decl. Oren Sellstrom Supp.
Pls.' Mot. Prelim. Inj. ("First Sellstrom Decl."), Ex. B, Inmate
Testing Chart ("Testing Chart") (May 4, 2020) (listing five
negative tests of ICE detainees); Third Souza Decl. ¶ 5 (adding
nineteen more).  As of April 28, about twenty-two staff members
had tested negative.  Decl. Oren Sellstrom Supp. Pls.' Mot.
Prelim. Inj. ("Second Sellstrom Decl."), Ex. D, Dep. Steven
Souza ("Souza Dep.") 288, ECF No. 151-4.  According to the
Special Master's Weekly Report filed in the Supreme Judicial
Court on May 4 regarding state inmates, BCHOC had administered
just twenty-three COVID-19 tests, nineteen of which were for
inmates.  Committee for Pub. Counsel Servs. v. Chief Justice of
the Trial Court, SJC-12926, Special Master's Weekly Report (May
4, 2020) App. 4, available at https://www.mass.gov/doc/sjc-
12926-special-masters-weekly-report-5420/download (last accessed
May 8, 2020).  In sum, the virus is clearly present in BCHOC,
though its current prevalence is unknown.

The Court acknowledges and commends the significant steps
that BCHOC has taken in order to prevent the spread of COVID-19
at the facility and treat anyone infected.  The Centers for
Disease Control and Prevention ("CDC") has issued guidance for
correctional facilities and detention centers.  CDC, Interim
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in

[13]

Correctional and Detention Facilities ("Interim Guidance") (Mar.
23, 2020), https://www.cdc.gov/coronavirus/2019-
ncov/downloads/guidance-correctional-detention.pdf.  ICE has
also issued a document requiring every facility housing
immigration detainees to, among other standards, comply with the
CDC's recommendations.  ICE, COVID-19 Pandemic Response
Requirements ("Pandemic Response Requirements") (Apr. 10, 2020),
https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCle
anFacilities.pdf.  The government vigorously asserts that BCHOC
has followed all of these recommendations.  Def.'s Mem. Supp.
Mot. Stay Further Releases 12-14, ECF No. 83.  The Court
previously noted several protective measures BCHOC has put in
place since February, including restricting contact with
outsiders, performing temperature screenings, and splitting up
detainees during meals and recreation.  Savino I, 2020 WL
1703844, at *1-2.  The Court recognizes the commendable efforts
of the BCHOC staff, who have been operating in difficult and
risky conditions where much is unknown.  It is necessary to
point this out given that, while the Court and the attorneys
have been conferring remotely due to the pandemic, the dedicated
professionals at BCHOC continue to perform their duties on site.
That is no small thing.

    Nonetheless, there remain critical safety gaps that
establish a likelihood of irreparable harm in the absence of

[14]

preliminary equitable relief.  Testing of both staff and

detainees has been minimal, so the real infection rate is a

mystery.  Measures to isolate the carriers and prevent the

disease's spread cannot succeed without testing.  The CDC has

cautioned for some time that even asymptomatic individuals may

be infected with COVID-19 and spread the virus.  See, e.g.,

Souza I, 2020 WL 1703844, at *2 (citing CDC, Social Distancing,

Quarantine, and Isolation (reviewed Apr. 4, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-

sick/social-distancing.html).  Indeed, asymptomatic spreaders

have been called the "Achilles' heel" of prevention strategies.[8]

Recognizing this weakness, the "Testing Blueprint" released by

the White House, CDC, and Food and Drug Administration ("FDA")

recommends that "congregate living settings" should "actively"

perform "sentinel monitoring," which "involves targeted,

voluntary testing of asymptomatic individuals."[9]  The logic is

simple.  As the Director-General of the World Health

Organization put it, "[y]ou cannot fight a fire blindfolded.

---

[8] Monica Gandhi, Deborah S. Yokoe, & Diane V. Havlir, M.D.,
Asymptomatic Transmission, the Achilles' Heel of Current
Strategies to Control Covid-19, New England J. of Medicine (Apr.
24, 2020), https://www.nejm.org/doi/10.1056/NEJMe2009758.

[9] White House, CDC & FDA, Testing Blueprint 3 & n.1 (Apr.
27, 2020), https://www.whitehouse.gov/wp-
content/uploads/2020/04/Testing-Blueprint.pdf.

And we cannot stop this pandemic if we don't know who is
infected."[10]

A related problem is the "insufficient and ad hoc" contact
tracing of Detainees and BCHOC staff who may have interacted
with COVID-19-positive individuals. Pls.' Suppl. Mem. 11. The
White House, CDC, and FDA advise that "contact tracing can help
prevent or contain outbreaks, especially within . . . congregate
living settings in which the residents are particularly
vulnerable to rapid spread." Testing Blueprint 6. "Contact
tracing . . . is a key strategy for preventing further spread of
COVID-19."[11] Particularly in "congregate living settings," the
CDC stresses, contact tracing "is a priority."[12]

While BCHOC made some efforts at contact tracing for
employees who tested positive, there were no follow-up tests
ordered for those with whom the employees may have come into
contact and no written policy related to contact tracing at all.
Souza Dep. 279-80, 288. Nor is there any evidence that those

_____

[10] World Health Organization, WHO Director-General's Opening
Remarks at the Media Briefing on COVID-19 (Mar. 16, 2020),
https://www.who.int/dg/speeches/detail/who-director-general-s-
opening-remarks-at-the-media-briefing-on-covid-19---16-march-
2020 ("We have a simple message for all countries: test, test,
test.").

[11] CDC, Contract Tracing: Part of a Multipronged Approach to
Fight the COVID-19 Pandemic ("CDC Contact Tracing") 1 (Apr. 29,
2020), https://www.cdc.gov/coronavirus/2019-
ncov/downloads/php/principles-contact-tracing-booklet.pdf.

[12] Id. at 2.

who came into contact with COVID-19-positive employees or

detainees practiced quarantining as if they were symptomatic

themselves, as the CDC expressly recommends.  CDC, <u>FAQs for

Administrators, Staff, People Who Are Incarcerated, and Families</u>

("<u>CDC FAQs for Detention Centers</u>") (Apr. 9, 2020),

<u>https://www.cdc.gov/coronavirus/2019-</u>

<u>ncov/downloads/316368A_FS_COVID19_CorrectionDetention.pdf</u>

("Close contacts of the sick person (who have been within 6 feet

of the sick person or have had direct contact with infectious

droplets, such as from a cough or squeeze) should self-

quarantine at for 14 days home and follow CDC recommended steps

for people who are sick with COVID-19 symptoms.").

    Of particular concern is the contradictory evidence in the

record regarding monitoring of those Detainees who are

especially vulnerable to COVID-19.[13]  In an affidavit dated April

2, 2020, BCHOC's medical director averred that "[w]e are also

monitoring and reviewing all detainees/inmates who are known to

have chronic disease or other comorbidities which would make

them more susceptible to a COVID-19 infection."  Aff. Nicholas

_____

    [13] <u>See</u> CDC, <u>People Who Are at Higher Risk for Severe
Illness</u>, <u>https://www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/people-at-higher-risk.html</u> (last accessed May 8,
2020) ("Based on currently available information and clinical
expertise, **older adults and people of any age who have serious
underlying medical conditions** might be at higher risk for severe
illness from COVID-19.") (emphasis in original).

J. Rencricca, MD, PhD ¶ 20.  The sheriff swore to similar

effect.  Hodgson Aff. ¶ 6(k).  Yet when asked in depositions

conducted nearly a month later, BCHOC's nursing supervisor for

ICE detainees and its superintendent denied that vulnerable

detainees were subject to special monitoring or protocols.

Sellstrom Decl., Ex. B, Dep. Nelly Floriano (Rough Tr.) 95-96,

ECF No. 151-2; Souza Dep. 81-82.  Moreover, ICE requires

detention centers to notify ICE "12 hours after identifying any

detainee who meets the CDC's identified populations potentially

being at higher-risk for serious illness from COVID-19."

Pandemic Response Requirements 5-6.  ICE says it will then

"review the case to determine whether continued detention is

appropriate," id. at 14.  The record is devoid of any such

notification or consideration for release.  See Souza Dep. 236-

37; Pls.' Suppl. Mem. 12 n.9.  This is obviously worrying.

　　　Additionally, the chances of a more dangerous outbreak

would rise were additional detainees to be added to the mix.

ICE acknowledges that "[t]he combination of a dense and highly

transient detained population presents unique challenges for ICE

efforts to mitigate the risk of infection and transmission."

Opp'n TRO, Ex. 2, Mem. from Enrique M. Lucero, ICE, to Detention

Wardens & Superintendents 1 (Mar. 27, 2020), ECF No. 26-2; see

also Interim Guidance 2 (listing "transfer of

incarcerated/detained persons between facilities and systems"

[18]

Add. 80

and "admitting new entrants" as examples of "many opportunities
for COVID-19 to be introduced into a correctional or detention
facility"); <u>CDC FAQs for Detention Centers</u> 1 ("Because of close
contact and the number of people in correctional and detention
facilities (including prisons and jails), staff and people who
are incarcerated are at greater risk for the spread of germs.").
Barring the government from adding new detainees ameliorates the
twin problems of detainee density and transience, thus lowering
the chances of further spread.

    The Court does not disagree with the government's
protestation that "[i]rreparable harm cannot be assumed from the
fact of the pandemic alone."  Opp'n 12.  It is the government's
<u>response</u> to the pandemic that matters.  On the evidence in the
record, it appears highly likely that serious harm would have
followed from the Court's inaction.  Had the Court stayed its
hand, little or no progress would have been made at BCHOC
towards accurately determining the virus' presence among the
detainees and staff and towards effectively separating potential
carriers from others -- and it is likely that the gains in
density reduction achieved through the bail orders would be
jeopardized by new arrivals.  This is not a case where "the
defendants implemented many of th[e] measures [in the
preliminary injunction] before the plaintiffs even filed the
complaint."  <u>Swain</u> v. <u>Junior</u>, ___ F.3d ___, No. 20-11622-C, 2020

WL 2161317, at *5 (11th Cir. May 5, 2020) (per curiam).  The
government has resisted widespread testing and has continued to
accept new detainees.  Accordingly, the Court found that the
Detainees showed a likelihood of irreparable harm.

### C.  Likelihood of Success on the Merits

The Detainees' claim on the merits is that the conditions
of their confinement violate the Due Process Clause of the Fifth
Amendment.  Pet. ¶¶ 98-105.  Underlying their claim is the
cardinal principle that when the government "so restrains an
individual's liberty that it renders him unable to care for
himself, and at the same time fails to provide for his basic
human needs -- e.g., food, clothing, shelter, medical care, and
reasonable safety -- it transgresses . . . the Due Process
Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489
U.S. 189, 197 (1989).

The barebones constitutional demand on the government is
"to refrain at least from treating a pretrial detainee with
deliberate indifference to a substantial risk of serious harm to
health." Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir.
2011) (citing City of Revere v. Massachusetts Gen. Hosp., 463
U.S. 239, 244 (1983) & Farmer v. Brennan, 511 U.S. 825, 835
(1994)).  "Proof of deliberate indifference requires a showing
of greater culpability than negligence but less than a purpose
to do harm," id. (citing Farmer, 511 U.S. at 835), "and it may

[20]

consist of showing a conscious failure to provide medical services where they would be reasonably appropriate," id. (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). "To show such a state of mind, the plaintiff must provide evidence that the defendant had actual knowledge of impending harm, easily preventable, and yet failed to take the steps that would have easily prevented that harm." Leite v. Bergeron, 911 F.3d 47, 52-53 (1st Cir. 2018) (quoting Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018)) (further citation and internal quotation marks omitted). "This standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness." Id. at 53 (quoting Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999)). Courts generally apply the same standard for civil immigration detainees as for pre-trial detainees. See E. D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019) (stating that "the legal rights of an immigration detainee [are] analogous to those of a pretrial detainee" and collecting cases of other circuits).

There is little doubt that the Detainees would likely demonstrate at trial a substantial risk of serious harm to their health arising from their conditions of confinement amidst the COVID-19 outbreak. The CDC states that "[i]ncarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread

[21]

Case 1:20-cv-10617-WGY   Document 175   Filed 05/12/20   Page 22 of 34

once introduced." Interim Guidance 2. "Social distancing," the
CDC explains, "is the practice of increasing the space between
individuals and decreasing the frequency of contact to reduce
the risk of spreading a disease (ideally to maintain at least 6
feet between all individuals, even those who are asymptomatic)."
Id. at 4. Social distancing "is a cornerstone of reducing
transmission of respiratory diseases such as COVID-19." Id.
Were it not for the Court's bail orders and preliminary relief -
- all of which expire upon a ruling on the merits, and thus
cannot decide the merits -- the Detainees would be packed
together in close quarters where social distancing is
impossible. See Savino I, 2020 WL 1703844, at *2 (describing
close living quarters before bail releases). This threat would
be compounded by lackluster testing and contact tracing, as well
as inattention to those with special vulnerabilities. The virus
is present in BCHOC and is hardly going to stop in its tracks.

     There is still much to learn about the COVID-19 virus and
its confoundingly uneven assault on humanity.[14] Though COVID-19
surely poses a greater threat to those with CDC-recognized
heightened risk factors, "it cannot be denied that the virus is
gravely dangerous to all of us." Savino I, 2020 WL 1703844, at

_____

     [14] James Hamblin, Why Some People Get Sicker Than Others,
The Atlantic (Apr. 21, 2020),
https://www.theatlantic.com/health/archive/2020/04/coronavirus-
immune-response/610228/.

*7.[15]  Given what is now (preliminarily) known about the virus
and the facts on the ground in BCHOC, the Detainees would likely
show a substantial risk of serious harm resulting from their
confinement in such conditions.

The more difficult question is whether the Detainees have
shown that the government is likely deliberately indifferent to
that risk.[16]  The staff at BCHOC have admirably taken significant
steps toward protecting the Detainees from COVID-19.
Nonetheless, the Detainees have demonstrated at least three
cavernous holes in the government's mitigation strategy -- holes
it has obstinately refused to plug throughout this litigation.

---

[15] See Nancy Chow et al., CDC COVID-19 Response Team,
Preliminary Estimates of the Prevalence of Selected Underlying
Health Conditions Among Patients with Coronavirus Disease 2019 —
United States, February 12–March 28, 2020, 69 Morbidity &
Mortality Weekly Report 382, 382–84 (Apr. 3, 2020),
https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6913e2-H.pdf.

[16] At oral argument, counsel for the Detainees suggested
that the deliberate indifference standard must be satisfied only
in the Eighth Amendment context, not for civil detainees whose
claim lies in the Fifth Amendment's due process right.  The
distinction matters little, however, because the First Circuit
has stated that "[t]he two standards are not all that far
apart." Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011).
Several circuits now hold, after Kingsley v. Hendrickson, 135 S.
Ct. 2466 (2015), that the inquiry under the Due Process Clause
is purely objective, with a subjective inquiry reserved for the
Eighth Amendment context.  See Banks v. Booth, No. 20-849(CKK),
2020 WL 1914896, at *6 (D.D.C. Apr. 19, 2020) (citing cases).
Yet the First Circuit has continued to conduct the subjective
inquiry in due process cases even after Kingsley.  See Miranda-
Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016);
Couchon v. Cousins, No. 17-10965-RGS, 2018 WL 4189694, at *6 (D.
Mass. Aug. 31, 2018) (Stearns, J.).

See Farmer, 511 U.S. at 846 (holding that, in determining deliberate indifference, district court has "discretion" to consider "developments that postdate the pleadings and pretrial motions").

First, the government has steadfastly objected to the release on bail of all Detainees after the first six (and two others it wished to substitute for two whom the Court released). The exigencies of the moment demand flexibility. Both state and federal governments have recognized the need to release some incarcerated individuals in order to allow for minimal social distancing. Congress responded to the pandemic by authorizing the Bureau of Prisons to exceed the statutory maximum period of home confinement if the Attorney General makes a finding of "emergency conditions." CARES Act, Pub. L. No. 116-136, § 12003(b)(2) (2020). The Attorney General has found such an emergency.[17] The Massachusetts Supreme Judicial Court has ordered that, "[t]o decrease exposure to COVID-19 within correctional institutions, any individual who is not being held

---

[17] See Memorandum of Attorney General William Barr to Director of Bureau of Prisons (Apr. 3, 2020), https://www.justice.gov/file/1266661/download; Memorandum of Attorney General William Barr to Director of Bureau of Prisons (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (directing the Bureau of Prisons "to prioritize the use of [its] various statutory authorities to grant home confinement to inmates seeking transfer in connection with the ongoing COVID-19 pandemic").

without bail . . .  and who has not been charged with an
excluded offense (i.e., a violent or serious offense . . .) is
entitled to a rebuttable presumption of release." Committee for
Pub. Counsel Servs. v. Chief Justice of the Trial Court, 484
Mass. 431, 435, 142 N.E.3d 525, 530 (2020).  ICE itself requires
that "[e]fforts . . . be made to reduce the population to
approximately 75% of capacity." Pandemic Response Requirements
13.  As mentioned above, ICE also requires that BCHOC report the
identities of vulnerable detainees and promises to "review the
case to determine whether continued detention is appropriate."
Id. at 14.  The Court has not seen evidence of any reporting to
ICE or of a review of Detainees at BCHOC for possible release.

        The directives of the Attorney General, the Supreme
Judicial Court, and ICE's nationwide policy do not encapsulate
the Constitution's demands in this crisis.  The Court mentions
these policies for a different reason: they highlight that
diverse governmental actors see the need for serious thought and
actual efforts to release those whose confinement is not worth
the cost.  In this case, the authorities have displayed the
contrary mindset.  Where elasticity is vital, they are rigid;
where life hangs upon a carefully drawn line, they opt for near-
blanket incarceration.  That is evidence of deliberate
indifference.  See Battista v. Clarke, 645 F.3d 449, 453 (1st
Cir. 2011) (affirming preliminary injunction issued after

finding of deliberate indifference stemming from prison
authorities' "composite of delays, poor explanations, missteps,
changes in position and rigidities . . . taken to an extreme");
Pesce v. Coppinger, 355 F. Supp. 3d 35, 47 (D. Mass. 2018)
(Casper, J.) (issuing preliminary injunction on basis of
likelihood of deliberate indifference when prison authorities
"implemented a blanket policy prohibiting the use of methadone
treatment . . . without any indication that they would consider
[the plaintiff's] particular medical history and prescribed
treatment in considering whether departure from such policy
might be warranted").

　　　In fairness, ICE has made some headway on its own.  Through
a combination of deportations, bond releases by immigration
officials, and the six releases on Orders of Supervision, ICE
has managed to transfer about thirty individuals out of BCHOC
since the start of this litigation (though it has also added
five in).  Yet the record tends to show that the government
never formulated a plan to determine a safe population level or
how to reach that mark.  Souza Dep. 231-34.  The few bond
releases were conducted "in the normal course," not as part of a
strategy to reduce the density of detainees, and even those
dried up in mid-April.  Def.'s Input Apr. 22 List 2, ECF No.
111.  Deportations are always a slow business and the pandemic
has introduced new complexities.  It has been apparent from the

[26]

start that these mechanisms alone would not reduce the population to a density that could safely withstand the COVID-19 onslaught.  The government was indifferent.

When this Court forced individual bail applications upon the government, it resisted all of them.  Day in and day out, the Court was told that "[i]t is ICE's position, for the record, that release of none of the listed individuals is required for either their safety or the safety of the remaining civil detainee population at BCHOC."[18]  Opposition was understandable for some of the forty-four whom the Court admitted to bail, but at least twenty-five of those had either no criminal records or minimal or nonviolent ones (e.g., fraud, operating under the influence, larceny, drug possession, or failure to appear) along with mitigating circumstances that indicated little continued threat to the public.  Several also had health conditions elevating their risk from the virus.  ICE is free to disagree with this Court's determination regarding this or that individual's aptness for release.  A wholesale blockade on bail, however, cannot be justified when the government proffers no alternative method of reducing the population to a safe number.

---

[18] That refrain calls to mind "Bartleby, the Scrivener," who met every reasonable request with a firm "I would prefer not to."  Herman Melville, The Piazza Tales 51-52 (1856).

The government began this litigation suggesting, contrary
to all known expert guidance, that social distancing was
unnecessary because the virus could somehow be kept out of
BCHOC.  Savino I, 2020 WL 1703844, at *4 n.7.  Even after the
fallacy of this view became apparent, as eleven staff members
and one Detainee tested positive, the government continued to
argue that "BCHOC is not like the world at large" since it "is
able to control who comes into its facility, where they go, and
what steps are taken to screen such individuals.  Social
interaction, the primary focus of the social distancing
recommendations, is much more limited at BCHOC than in the
outside world."  Opp'n 29.  This thinking flies in the face of
the CDC's direct warnings that detention centers are hardly
impregnable fortresses and that, in fact, they are more
susceptible to outbreaks once the virus penetrates.  Interim
Guidance 2 ("There are many opportunities for COVID-19 to be
introduced into a correctional or detention facility, including
daily staff ingress and egress . . . .");  id.
("Incarcerated/detained persons live, work, eat, study, and
recreate within congregate environments, heightening the
potential for COVID-19 to spread once introduced.").  The
government's purported rationale for refusing to work toward a
safe population level was beyond "the realm of reason."  Kosilek

v. <u>Spencer</u>, 774 F.3d 63, 92 (1st Cir. 2014) (en banc) (quoting

<u>Battista</u>, 645 F.3d at 454).

The other acute flaws in the government's prevention
strategy are the lack of testing and contact tracing.  The
record indicates that BCHOC tested no Detainees before April,
five in April, and at least twenty on May 1 (following a violent
clash between Detainees and staff that broke out, it seems, over
an effort to test certain Detainees).  Testing Chart; Third
Souza Decl. ¶ 5.  Yet it is apparent that many Detainees and
staff have not yet been tested; nor does the record demonstrate
adequate contact tracing.  <u>See</u> <u>supra</u> IV.B (discussing evidence
of testing and contact tracing).  Without robust testing and
contact tracing, the spread of the virus cannot be known or
contained.[19]  Keeping individuals confined closely together in
the presence of a potentially lethal virus, while neither
knowing who is carrying it nor taking effective measures to find
out, likely displays deliberate indifference to a substantial
risk of serious harm.  That is what the evidence shows here.

---

[19] <u>See</u> <u>Testing Blueprint</u> 3 (recommending "targeted,
voluntary testing of asymptomatic individuals" in "congregate
living settings" to assess and contain potential spread); <u>CDC
Contact Tracing</u> 1-2 ("Contact tracing . . . is a key strategy
for preventing further spread of COVID-19," and "is a priority"
in "congregate living settings.").

On these facts, taken together, the Court found that the Detainees would likely succeed on the merits of their due process claim.

**D.   Balance of the Hardships and the Public Interest**

The Supreme Court has stated in the immigration context that the final two factors -- "assessing the harm to the opposing party and weighing the public interest" -- typically "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).  Accordingly, the Court will analyze these factors together.

The hardship caused to the Detainees by remaining in unsafe conditions needs no further elaboration.  Moreover, the Supreme Court has noted that "[o]f course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." Id. at 436.  Thus, allowing harm to befall the Detainees is contrary to the public interest as well.

On the other side of the scale, this preliminary injunction causes minimal hardship to the government or injury to the public.  The primary interests that the government (and the public) have in operating this detention system are twofold: ensuring the deportation of those unlawfully present and confining those deportable individuals who may be dangerous to the public.  This preliminary injunction does not meaningfully

[30]

impede either of these objectives, since it neither prohibits
the government from deporting any Detainee nor prevents it from
confining a new individual in a different facility.[20]  The
hardship to the government here, such as it is, boils down to
providing tests.  That burden pales in comparison to the public
health benefits of thwarting the spread of COVID-19 within this
detention center.  Indeed, the public has a powerful interest in
ensuring that there is not an outbreak within the detention
center that is then primed to spread via the staff to the wider
community.

    This latter point is paramount.  The government's
"custodial duty" has both "inward" and "outward" aspects: that
is, the government must guard the health and safety of those
incarcerated within its facility, as well as protect the outside
public from dangerous detainees.  United States v. Volungus, 595
F.3d 1, 8 (1st Cir. 2010).  In one sense, this case exposes the
tension between those dual responsibilities.  The Detainees
legitimately complain of unsafe crowded quarters amidst the
COVID-19 pandemic and demand release, while the government --
just as legitimately -- objects that many of the petitioners are
too dangerous to let out.  The Court has sought to balance these
considerations by making individualized bail determinations,

---

    [20] There is no evidence in the record suggesting that ICE
has nowhere else to put new detainees other than BCHOC.

releasing to house arrest enough detainees as to hamper the
virus' spread but not those who pose real danger to the public.

Yet the dichotomy is somewhat misleading here.  Even the
government's "outward" protective duties of custody, those it
owes to the public at large, are jeopardized by locking up as
many inmates as possible.  The virus, if allowed to thrive in
the detention centers, will migrate back into our neighborhoods.
At least eleven officers or other staff, one immigration
detainee, and one state inmate at Bristol County House of
Correction have already tested positive for COVID-19; many
others have yet to be tested.  Employees returning to their
homes after their shifts may expose their families, friends, bus
drivers, cashiers, and doctors.  The chain of infection thus
grows.  Were the government to loose an uncontainable viral
outbreak from within its detention centers, it would betray its
duty to the public, not just to the detainees.  Seen in this
light, the government's "inward" and "outward" custodial duties
converge upon the need to deny the virus a habitat inside the
facility.  This convergence suggests that the balance of
hardships and the public interest weigh heavily in favor of a
preliminary injunction.

[32]

V.    **CONCLUSION**

Having found that all factors point towards awarding interim equitable relief, the Court issued the following preliminary injunction:

1.  As soon as reasonably possible, all immigration detainees at Bristol County House of Correction and staff who come into contact with them must be tested for COVID-19.  The Court shall be satisfied with a polymerase chain reaction (PCR) test approved by the Food and Drug Administration for this purpose.  The test shall be provided at no cost to the detainees or BCHOC staff; if there are costs, ICE is to bear them.  Anyone covered by this order may decline to be tested, but a declination shall be treated as a positive COVID-19 result and that person shall be presumed to be carrying the COVID-19 virus.

2.  No new immigration detainees may be admitted to Bristol County House of Correction.  Any detainee who was already admitted but has left or will leave the facility, for whatever reason, shall not return.

3.  The above orders shall automatically dissolve upon the latter of the following two events: (a) the Judicial Conference of the United States rescinds its authorization under the CARES Act for the use of video

[33]

and teleconferencing during certain proceedings;[21] (b) the
Supreme Judicial Court rescinds the rebuttable
presumption of release for certain inmates it has
described in <u>Committee for Pub. Counsel Servs.</u> v. <u>Chief
Justice of the Trial Court</u>, 484 Mass. 431, 142 N.E.3d 525
(2020).

4. At a hearing held on May 11, 2020, the Court modified the
preliminary injunction as follows: No immigration
detainee shall be transferred from the Bristol County
House of Correction to another detention center until the
testing required by the preliminary injunction has been
performed and the Court has been informed that the test
was negative.  If the individual declines the test, then
that person may be moved upon proper notice to the Court
so long as existing ICE protocols having to do with the
health of the individual are followed.  The order in this
paragraph shall dissolve together with the rest of the
preliminary injunction.

**SO ORDERED.**

/s/ William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[21] <u>See</u> <u>Judiciary Authorizes Video/Audio Access During COVID-
19 Pandemic</u> (Mar. 31, 2020),
https://www.uscourts.gov/news/2020/03/31/judiciary-authorizes-
videoaudio-access-during-covid-19-pandemic.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
MARIA ALEJANDRA CELIMEN SAVINO, )
JULIO CESAR MEDEIROS NEVES,     )
and all those similarly situated,  )
                               )
          Plaintiffs-Petitioners,  )
                               )                CIVIL ACTION
     v.                        )                NO. 20-10617-WGY
                               )
STEVEN J. SOUZA, Superintendent of  )
Bristol County House of Correction  )
in his official capacity,      )
                               )
          Defendant-Respondent.  )
                               )
_____
```

YOUNG, D.J.                                        June 18, 2020

**MEMORANDUM**

**I.    INTRODUCTION**

This memorandum sets the record straight.  First, it reiterates the Court's questions, raised in hearings held on June 3 and 15, as to which counsel for respondent ("the government") requested further clarification.  Second, the Court takes this opportunity briefly to explain why, at the June 3 hearing, the Court denied the government's motion for reconsideration of the preliminary injunction ("Mot. Recon."), ECF No. 185, and forthrightly to "address the [government's] argument that the preliminary injunction decision was incorrect," Obj. Recharacterization 1, ECF No. 200.

## II.   THE COURT'S TWO QUESTIONS

At hearings held via videoconference on June 3 and 15, 2020, the Court asked the government whether it was complying with two procedures set by the Centers for Disease Control and Prevention ("CDC") and U.S. Immigration and Customs Enforcement ("ICE").  The government provided no clear answer at the first hearing and requested clarification at the second, which the Court now provides.  Both of these issues were flagged by the Court in its preliminary injunction opinion, issued on May 12, 2020.  See Savino v. Souza, ___ F. Supp. 3d ___, No. 20-10617-WGY, 2020 WL 2404923, at *6 (D. Mass. May 12, 2020).

First, has the government been complying, throughout this litigation, with the CDC's guidance that staff who are "close contacts" of individuals who have tested positive for COVID-19 must self-quarantine at home for 14 days?  This guidance, stated on page 12 of the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC's Interim Guidance") (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf, reads in relevant part: "**If a staff member is identified as a close contact of a COVID-19 case (either within the facility or in the community):** self-

[ 2 ]

quarantine at home for 14 days and return to work if symptoms do
not develop" (emphasis in original).[1]

Second, (a) has the government been complying with ICE's
requirement that detention facility staff must "[n]otify both
the ERO Field Office Director (or designee) and Field Medical
Coordinator as soon as practicable, but in no case more than 12
hours after identifying any detainee who meets the CDC's
identified populations potentially being at higher-risk for
serious illness from COVID-19," ICE, Enforcement and Removal
Operations (ERO), COVID-19 Pandemic Response Requirements 6
(Apr. 10, 2020),
https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCle
anFacilities.pdf; and (b) has ICE been "review[ing] the case[es]
to determine whether continued detention is appropriate," making
"such custody determinations on a case-by-case basis, pursuant
to the applicable legal standards, with due consideration of the
public health considerations implicated," id. at 14?  At the
June 15 hearing, the Court overstated ICE's commitment by
suggesting that "hearings" were required; in fact, ICE has
committed itself only to "review" the cases, with or without a

_____

[1] A person is defined as a "close contact if they a) have
been within approximately 6 feet of a COVID-19 case for a
prolonged period of time or b) have had direct contact with
infectious secretions from a COVID-19 case (e.g., have been
coughed on)."  CDC's Interim Guidance 3.

hearing.  That being so, the Court inquires whether, throughout this litigation, this notification-and-review procedure has been carried out as ICE's policy requires.

The Court also underscores a question it asked during the June 15 hearing seeking to clarify the large discrepancy between the parties' lists of medically vulnerable detainees (under the CDC guidelines) currently held at Bristol County House of Correction (BCHOC): the government has identified only ten such people, see ECF No. 212, while the petitioners count as many as thirty-three, see ECF No. 222.  The CDC's guidelines do not appear to be so vague as to allow such a wide discrepancy.

## III. THE LIKELIHOOD OF FINDING DELIBERATE INDIFFERENCE

In issuing a preliminary injunction in this case, the Court ruled that the petitioners had shown a likelihood of success on the merits, which would entail proving that the government exhibited "deliberate indifference to a substantial risk of serious harm" to the detainees' health.  Savino, 2020 WL 2404923, at *7 (quoting Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011)).  The Court's reasoning rested on three pillars: (1) the government's refusal voluntarily to work toward reducing the population of the facility to a density in which social distancing would be possible; (2) the government's failure to test any asymptomatic detainees or staff, notwithstanding the known risk of asymptomatic infection; and

[4]

(3) the lack of adequate contact tracing, including the issue of "close contacts" discussed at the outset of this memorandum. See id. at *7-10.  The government's motion for reconsideration is principally an attack on each of these three pillars.

**A.    The Government's Blanket Opposition to Bail**

The government makes the surprising argument that the Court's description of the government's "wholesale blockade on bail," id. at *9, "is not a fair or accurate characterization." Mot. Recon. 16.  This is so, the government explains, because ICE's formal opposition to release on bail by the Court of all but six detainees was only its position "for the record"; in practice, however, "fully half of those releases were with Defendants' tacit approval."  Id.  How was that tacit approval manifested?  The government explains that, along with a general objection to all releases, it specifically highlighted a smaller "subset of detainees who should not be released."  Id. at 15. Thus, the government maintains, it partnered with the Court in a "collective process" of releasing detainees and deserves credit for many of the releases on bail.  Id. at 25.

This narrative is fanciful.  There was no "tacit approval" or "collective process" of releases.  Laboring hard and in good faith, counsel for the government helpfully singled out particular detainees as being especially unfit for bail in order to steer the Court away from those individuals.  Yet that does

[5]

not imply that the government agreed that others should be
released, let alone worked toward that goal.  It did not.  At
the end of the day the government's position was uncompromising.
It was also off the wall.  To see why, it is useful to look at
the big picture and the small one.

First the big picture.  Social distancing is a
"cornerstone" of COVID-19 prevention.  CDC's Interim Guidance 4.
This was the major problem in BCHOC at the start of this
litigation, since the detainees were indisputably sleeping and
eating very close to one another.  The government never argued
that the full cohort of 148 BCHOC detainees could achieve
effective social distancing.[2]  Instead, it chose to pretend that
social distancing was not critical, repeatedly asserting that
the facility was safe because the virus could somehow be kept
outside -- even after numerous staff and one detainee tested
positive.  See Savino, 2020 WL 2404923, at *9.  The government's
prevention strategy, as initially conceived and never disavowed,
was essentially all Plan A and no Plan B.  To borrow a driving

_____

[2] In support of its motion to stay further releases, the
government did argue that, as of April 14 when 92 detainees were
held at BCHOC, "appropriate six foot social distancing is fully
achievable."  Defs.' Mem. Supp. Mot. Stay Further Releases 9,
ECF No. 83.  The government also contended that the safe
population number "is not 100 and it's certainly not below 100."
Tr. Hr'g (Apr. 9, 2020) 20:7-8, ECF No. 148.  The Court denied
the motion to stay, since it could not yet "determine[e] the
merits of this case" by settling on a safe number.  ECF No. 86.

[6]

analogy from the government,[3] it is like a NASCAR driver who
spurns a seatbelt and helmet because she plans not to crash.

The government is still justifying its daredevil mindset,
recently explaining that it "had no reason to think that the
starting number [of detainees] was too high" and therefore it
"did not embrace the concept of population density reduction."
Defs.' Mem. Appropriate Level Detainee Population ("Population
Mem.") 4-5 & n.4, ECF No. 214.  (How this admission can be
squared with the government's supposed "tacit approval" of bail
releases is anyone's guess.)  This is emphatically not a case in
which the government "has been working toward exactly what the
plaintiffs seek: a reduction in [the facility]'s population."
Swain v. Junior, No. 20-11622, 2020 WL 3167628, at *10 (11th
Cir. June 15, 2020) (emphasis in original).[4]

---

[3] The government likens the Court's conduct to "getting in
the driver's seat, picking the destination and blaming the
passengers for not driving the car."  Mot. Recon. 5.  The better
comparison, however, would be to a driver getting on the highway
northbound and faulting the passenger for remarking at every
exit, "I would get off here and go south."

[4] The government oddly states that even had there only been
74 detainees at the start of the litigation "the Court would
likely have assumed that the starting number was too high."
Population Mem. 4.  That's a very strange thing to say.  The
Court has made clear in two written opinions and numerous
hearings that the main problem is crowding in conditions that do
not allow for social distancing.  If there were only 74
detainees and they had adequate space, why would the Court have
assumed that was unsafe?  Cf. Baez v. Moniz, No. 20-10753-LTS,
2020 WL 2527865, at *8 (D. Mass. May 18, 2020) (Sorokin, J.)
(rejecting Eighth Amendment claim regarding COVID-19 prevention
for 70 detainees in shared cells or dorms when defendant

[7]

Now the small picture.  Andrea James, a 54-year-old grandmother with diabetes and hypertension, arrived in ICE custody after serving twenty years in prison for cocaine distribution in 1998.  The government opposed bail because "ICE believes her to be a danger to the community."[5]  Georgios Nikiforides is a 49-year-old electrician who has been in the U.S. since he was two years old.  His criminal history consists of two convictions for assault, in 2002 and 2012, but he has since been awarded a full pardon.  He has chronic obstructive pulmonary disease, with a recent history of hospitalization for pneumonia, as well as hypertension.  ICE opposed his release because he "is a threat to public safety."[6]  Other examples are the 54-year-old grandfather of two U.S. citizens whose sole non-immigration offense is for shoplifting and the 57-year-old Walmart employee with hypertension whose only criminal history is immigration fraud.  As Judge Chhabria found in similar circumstances, "ICE's insistence on opposing these bail applications on a blanket basis has led it to take some positions that are downright irrational, not to mention

---

"offered diagrams and photographs demonstrating his efforts to ensure that all beds in such units have at least six feet of space between their heads").  As the government correctly observes, the Court has not yet made a determination regarding a safe population level at BCHOC.

[5] Defs.' Input Apr. 7 List, Ex. 1 at 1, ECF No. 50-1.

[6] Defs.' Input Apr. 8 List, Ex. 1 at 1, ECF No. 58-1.

inhumane." Zepeda Rivas v. Jennings, No. 20-cv-02731-VC, 2020 WL 3055449, at *2 (N.D. Cal. June 9, 2020).

## B.    Testing and Contact Tracing

The other two pillars supporting the Court's ruling of a likelihood of deliberate indifference were the inadequate testing and contact tracing at BCHOC.

Regarding contact tracing, the government claims that "BCHOC was doing the same form of contact tracing done by most other Sheriffs' Offices," faults the Court for relying upon the "silence" of the record when it "never asked for evidence of the contact tracing," and adds: "Nor was contact tracing the standard of care for correctional facilities at the outbreak of the litigation." Mot. Recon. 24. These arguments are unpersuasive. Contact tracing absolutely was the standard of care for correctional facilities from the outset -- indeed, the CDC required self-quarantining for "close contacts" of COVID-19, as the Court observed in its prior opinion and has now reiterated in the first part of this memorandum. In any event, the Court properly looked beyond "the outbreak of the litigation" to the ongoing developments up to the date of the preliminary injunction. See Savino, 2020 WL 2404923, at *8 (citing Farmer v. Brennan, 511 U.S. 825, 846 (1994)). The silence of the record spoke volumes.

[ 9 ]

The government also chides the Court for relying on the
lack of testing for asymptomatic individuals since "no one was
recommending widespread testing for asymptomatic persons before
the end of April." Mot. Recon. 18. The Court is aware and
appreciates that COVID-19 tests were scarce through March and
part of April, and that the expert recommendations have evolved
during this litigation. For instance, the CDC now recommends,
reflecting changes apparently made on June 13, "testing for
asymptomatic individuals without known or suspected SARS-CoV-2
exposure for early identification in special settings," such as
in "correctional and detention facilities."[7]

The preliminary injunction was issued on May 7. By then,
strategic testing of at least some asymptomatic detainees and
staff had become both necessary and feasible. In Massachusetts,
"[o]n April 22, 2020, large-scale mobile testing became
available to the [Department of Correction], and it began
administering tests to any inmate or patient who voluntarily

---

[7] CDC, Overview of Testing for SARS-CoV-2 (revised June 13,
2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-
overview.html (last accessed June 16, 2020). On May 11, at the
White House's official televised COVID-19 briefing, Admiral
Brett Giroir stated "[r]ight now, in America, anybody who needs
a test can get a test," including for purposes of "contact
tracing" and "asymptomatic surveillance" -- and he had earlier
stated that this group "include[s] those who are in prisons."
White House, Remarks by President Trump in a Press Briefing on
COVID-19 Testing (May 11, 2020),
https://www.whitehouse.gov/briefings-statements/remarks-
president-trump-press-briefing-covid-19-testing/.

agreed to be tested, facility by facility." Foster v.
Commissioner of Corr., 484 Mass. 698, 2020 WL 2844516, at *7
(Mass. June 2, 2020); see id. at *16 (declining to find
deliberate indifference in part because "increasingly throughout
the month of May, the DOC has begun widespread testing of
nonsymptomatic inmates, as well as offering testing to all
correction officers upon request").  On April 23, the Federal
Bureau of Prisons ("BOP") announced it had acquired rapid
testing equipment which would be used, in part, to test
"asymptomatic inmates" to "assist the slowing of transmission
with isolating those individuals who test positive and
quarantining contacts."[8]  On April 27, the CDC, White House, and
FDA released a "Testing Blueprint" recommending that "congregate
living settings" should "actively" perform "sentinel
monitoring," which "involves targeted, voluntary testing of
asymptomatic individuals."[9]

By May 7, the government had been aware for several months
that asymptomatic individuals can spread the virus.  Clearly,
some form of asymptomatic testing (not necessarily universal,

---

[8] BOP, Bureau of Prisons Expands COVID-19 Testing (Apr. 23,
2020),
https://www.bop.gov/resources/news/pdfs/20200423_press_release_c
ovid19_testing.pdf.

[9] White House, CDC & FDA, Testing Blueprint 3 & n.1 (Apr.
27, 2020), https://www.whitehouse.gov/wp-
content/uploads/2020/04/Testing-Blueprint.pdf.

[11]

but <u>something</u>) should have been on the government's radar and actively pursued.  The record revealed no efforts or general strategy to test at least some asymptomatic detainees and staff.[10]  On May 1, the superintendent affirmed that BCHOC "is not doing asymptomatic testing."[11]

## IV.    CONCLUSION

The government emphasizes "that BCHOC has a virtually-perfect record of no confirmed positives among the detainee population" and that "[n]o one knows which steps, or what combination of measures, is responsible for the remarkable limit of COVID-19 among the ICE detainees."  Population Mem. 3.  That is true.  Yet, just as "the increased rate of infection" does not itself prove deliberate indifference, <u>Swain</u>, 2020 WL 3167628, at *7, the absence of known infections does not disprove deliberate indifference.

We are not yet out of the woods.

**SO ORDERED.**

/s/ William G. Young    _
WILLIAM G. YOUNG
DISTRICT JUDGE

---

[10] The exception is the group of twenty detainees who were tested on May 1 following the violent episode in Unit B, where one detainee tested positive (but then tested negative two days later).  <u>See</u> <u>Savino</u>, 2020 WL 2404923, at *10.

[11] Decl. Oren Sellstrom Supp. Pls.' Mot. Prelim. Inj., Ex. D, Dep. Steven Souza 318:9-12, ECF No. 151-4; <u>see also</u> <u>id.</u> at 280:15-16 ("We do not do testing on staff.  We direct them to their [primary care physician].").